

Michael G. Adams
Secretary of State

**Commonwealth of Kentucky**
**Office of the Secretary of State**

· Summons Division
PO BOX 718
FRANKFORT, KY 40602-0718

February 1, 2024

LPL FINANCIAL, LLC
1055 LPL WAY
FORT MILL, SC 29715

**RECEIVED**

FEB 0 8 2024

LPL - Fort Mill, SC

FROM:   SUMMONS DIVISION
        SECRETARY OF STATE

RE:     CASE NO: 24-CI-000543

COURT:  Circuit Court Clerk
        Jefferson County
        700 West Jefferson St.
        Louisville, KY 40202
        Phone: (502) 595-3055

Legal action has been filed against you in the captioned case.  As provided under Kentucky law, the legal documents are enclosed.

**Questions regarding this action should be addressed to:**

**(1) Your attorney, or**
**(2) The attorney filing this suit whose name should appear on**
**the last page of the complaint, or**
**(3) The court or administrative agency in which the suit is filed**
**at the clerk's number printed above.**

The Kentucky Secretary of State has NO POWER to make a legal disposition of this case.  Your responsive pleadings should be filed with the clerk of the court or agency where the suit is filed and served directly on your opposing party.

No copy of future pleadings need be sent to this office unless you wish us to serve the pleading under a particular statute or rule and pay for said service.

---

| | | |
|---|---|---|
| AOC-E-105　　Sum Code: CI<br>Rev. 9-14<br><br>Commonwealth of Kentucky<br>Court of Justice　　Courts.ky.gov<br><br>CR 4.02; Cr Official Form 1 | <br><br>**CIVIL SUMMONS** | Case #: **24-CI-000543**<br>Court: **CIRCUIT**<br>County: **JEFFERSON Circuit** |

*Plantiff,* **LAMKIN WEALTH MANAGEMENT, LLC ET AL VS. LPL FINANCIAL, LLC**, *Defendant*

TO: **LPL FINANCIAL, LLC**
　　　**1055 LPL WAY**
　　　**FORT MILL, SC 29715**

RECEIVED

JAN 3 0 2024

SECRETARY OF STATE

The Commonwealth of Kentucky to Defendant:

　　You are hereby notified that a **legal action has been filed against you** in this Court demanding relief as shown on the document delivered to you with this Summons. **Unless a written defense is made by you or by an attorney on your behalf within twenty (20) days** following the day this paper is delivered to you, judgment by default may be taken against you for the relief demanded in the attached complaint.

　　The name(s) and address(es) of the party or parties demanding relief against you or his/her (their) attorney(s) are shown on the document delivered to you with this Summons.

*Davis L. Nicholson*
Jefferson Circuit Clerk
Date: **1/22/2024**

---

## Proof of Service

This Summons was:

☐ Served by delivering a true copy and the Complaint (or other initiating document)

　　To: _____

☐ Not Served because: _____

Date: _____, 20_____

　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　　　　　Served By

　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　　　　　Title

Summons ID: 720356948695394@00001056074
CIRCUIT: 24-CI-000543 Long Arm Statute – Secretary of State
LAMKIN WEALTH MANAGEMENT, LLC ET AL VS. LPL FINANCIAL, LLC



Page 1 of 1

**eFiled**

Filed          24-CI-000543      01/22/2024     David L. Nicholson, Jefferson Circuit Clerk
A true copy attest    24-CI-000543    01/22/2024    /s/David L. Nicholson, Jefferson Circuit Clerk

NO. **Filed Electronically**

JEFFERSON CIRCUIT COURT
DIVISION _____ (____)
*BUSINESS COURT DOCKET*
HON. _____

**LAMKIN WEALTH MANAGEMENT, LLC**                        PLAINTIFFS
901 Lily Creek Road, Suite 102
Louisville, Kentucky 40243

and

**LOUISVILLE WEALTH MANAGEMENT, LLC**
901 Lily Creek Road, Suite 102
Louisville, Kentucky 40243

v.                               **COMPLAINT**

**LPL FINANCIAL, LLC**                                   DEFENDANT
1055 LPL Way
Fort Mill, South Carolina 29715

    SERVE:    Kentucky Secretary of State

**** **** **** ****

Plaintiffs Lamkin Wealth Management, LLC and Louisville Wealth Management,

LLC (collectively "**LWM**"), initiates this action against Defendant LPL Financial, LLC

("**LPL**"), and alleges as follows:

## I.   PRELIMINARY STATEMENT

LWM, a wealth management business, brings the following claims against LPL

seeking redress for LPL's improper, illegal and unjustified actions against LWM as set

forth below.  Simply put, LPL orchestrated, assisted and executed a classic corporate raid

against LWM, its own affiliate, by the actions of three of LWM's employees, who were at

the time also affiliated with LPL.

Filed          24-CI-000543      01/22/2024     David L. Nicholson, Jefferson Circuit Clerk
A true copy attest    24-CI-000543    01/22/2024    /s/David L. Nicholson, Jefferson Circuit Clerk

Filed    Case 3:24-cv-00168-CHB    Document 1-1    Filed 03/08/24    Page 4 of 52 PageID #: 8
24-CI-000543    01/22/2024    David L. Nicholson, Jefferson Circuit Clerk
A true copy attest    24-CI-000543    01/22/2024    /s/David L. Nicholson, Jefferson Circuit Clerk

LWM's civil suit against those three former employees is currently the subject of litigation in Jefferson County Circuit Court in Louisville, Kentucky, currently on Appeal. (See *Lamkin Wealth Management, LLC, et al. v. Bruce Lindsay, et al.*, Court of Appeals, 2023-CA-0931-MR).

## II.    PARTIES, RELATED PERSONS, JURISDICTION AND VENUE

1.    Plaintiffs Lamkin Wealth Management, LLC and Louisville Wealth Management, LLC are limited liability companies existing under the laws of the Commonwealth of Kentucky with their principal places of business located at 901 Lily Creek Road, Suite 102, Louisville, Kentucky 40243. LWM provides wealth management and/or financial advisory services to its third-party clients.

2.    Defendant LPL is an independent broker-dealer with dual headquarters in Boston, Massachusetts and San Diego, California, and is a member of the Financial Industry Regulatory Authority ("**FINRA**") and the Securities Investor Protection Corporation ("**SIPC**"). LPL provides support to financial advisors, including investment solutions, technology platforms, resources, and services to financial professionals such as LWM.

3.    FINRA has jurisdiction over this matter pursuant to the FINRA Code of Arbitration because this dispute is between a FINRA member and one of its customers.

4.    At all material times, and as set forth below, LWM was affiliated with LPL as its broker-dealer.

## III.    FACTS

5.    LWM provides its clients individually tailored financial services, including wealth planning, estate planning, risk management planning, and small business

2

Filed                          24-CI-000543   01/22/2024   David L. Nicholson, Jefferson Circuit Clerk
A true copy attest       24-CI-000543   01/22/2024   /s/David L. Nicholson, Jefferson Circuit Clerk

planning. Mark Lamkin ("**Lamkin**") is the principal of LWM. In significant part, LWM serves its clients through its financial advisors, who assist and advise clients as to their investment portfolios, including insurance investments, and manage securities transactions on their behalf.

6.    LWM's business depends on acquiring, maintaining, and retaining exclusive business relationships with its clients. LWM acquires its clients through several sources, including hosting events, conducting seminars, and teaching classes on wealth management. In addition, and is common in the industry, LWM acquires clients through the purchase of the "book of business" of other financial advisors.

7.    LWM maintains and retains its exclusive business relationship with clients, in part, by entering into non-compete, non-solicitation, and trade secret agreements with its financial advisors, who advise client accounts on behalf of LWM. Such agreements are necessary and common, if not standard, in the wealth management and financial services industry.

8.    To execute securities transactions on behalf of clients, wealth management businesses such as LWM must be affiliated with a broker-dealer, as required by various state and federal laws and regulations.

9.    Defendant LPL is one of the largest broker-dealers in the country. LPL provides brokerage services to wealth management businesses. These services include executing securities trades, recording and tracking securities transactions, notifying clients of securities transactions, vetting securities transactions, recording and distributing commissions earned and paid on securities transactions, and providing advice to financial advisors and wealth management businesses. Wealth management businesses such as LWM and their financial advisors manage, account, record, and track

Filed                          24-CI-000543   01/22/2024   David L. Nicholson, Jefferson Circuit Clerk
A true copy attest       24-CI-000543   01/22/2024   /s/David L. Nicholson, Jefferson Circuit Clerk

Filed          24-CI-000543   01/22/2024          David L. Nicholson, Jefferson Circuit Clerk
A true copy attest          24-CI-000543   01/22/2024          /s/David L. Nicholson, Jefferson Circuit Clerk

their business relationships with their clients through platforms provided by broker-dealers such as LPL.

10.     Broker-dealers such as LPL are always aware prior to investment advisors leaving a branch or leaving the employment with or relationship with another investment advisor, that the terms of any non-compete or employment agreement must be reviewed to insure that doing so does not create liability for those involved in such change.

11.     From February 2001 until late 2018, Lamkin, and therefore LWM, were affiliated with LPL as their broker-dealer. Neither LWM nor any of its advisors were required to remain with LPL as their broker-dealer.

12.     As part of its affiliation with LPL, LWM used LPL's platform and/or software to manage and keep track of LWM's business relationships with LWM's clients, client accounts, the securities transactions executed on LWM's clients' behalf, and the commissions earned by LWM and/or its financial advisors on those transactions.

13.     LPL's platform assigns a "branch" number to a financial planning firm and further designated "rep codes" within that branch to identify commissions to be paid to financial advisors within that branch. When LWM was affiliated with LPL, LWM had branch designation B-451 and the financial advisors working for LWM had individual "rep codes" which were used when conducting securities transactions for LWM clients on accounts they advised.

14.     Securities trades on behalf of LWM's clients were recorded in the LPL platform using that branch designation, along with individual rep codes for LWM's individual financial advisors working for LWM's clients. LPL's system recorded and reflected all of the commissions being paid on the rep codes, and LWM's allocation of a

4

Filed        24-CI-000543   01/22/2024        David L. Nicholson, Jefferson Circuit Clerk
A true copy attest   24-CI-000543   01/22/2024        /s/David L. Nicholson, Jefferson Circuit Clerk

portion of those commissions to the advisor based on which of the advisor's rep codes was assigned to the client's account.

15.     Throughout LWM's affiliation with LPL, LWM's clients received monthly statements generated through the LPL platform containing the LWM logo.

16.     As a direct result of LWM's affiliation with LPL and its use of the LPL platform, LPL was intimately familiar with nearly every aspect of LWM's business, including its securities transaction business.  LPL's knowledge of LWM's business included details about each client and each client account as well as all securities transactions performed.  LPL knew of and was aware of the commissions earned by LWM and any LWM advisor working on the client account.  As a result, LPL knew and had awareness of the importance, value, and nature of the business relationships LWM had with both its advisors and its clients.

17.     In its communications with advisors and LWM, LPL repeatedly and consistently referred to the clients as LWM's clients and advertised its services as enabling LWM and its individual advisors to better serve LWM's clients.

18.     LPL also provided various advisory services to LWM and LWM's investment advisors.  Included among such advisory services was providing advice and guidance to advisors (such as LWM) with respect to acquiring or selling a "book of business."

19.     LWM has on multiple occasions purchased the book of business of a financial advisor.

20.     On or about February 17, 2015, LWM purchased the book of business of Bruce Lindsay ("**Lindsay**"), for which LWM paid Lindsay $541,000.00.  This Stock Purchase Agreement was set forth in a written document (attached hereto as **Exhibit A**). The assets purchased by LWM from Lindsay included all of Lindsay's rights in client

5

Filed          24-CI-000543      01/22/2024          David L. Nicholson, Jefferson Circuit Clerk
A true copy attest      24-CI-000543      01/22/2024          /s/David L. Nicholson, Jefferson Circuit Clerk

accounts, client lists, client files, any contract rights related thereto and all good will associated therewith related to Lindsay's business. LWM's Agreement with Lindsay further provided that Lindsay would not solicit or divert any business, activity, or service related to business from any person on the client list or from any person who is or was an actual, potential or prospective customer or client of LWM after the date of the Agreement.

21. After the purchase, Lindsay joined LWM as a financial advisor. In that role, Lindsay provided wealth management and financial advisory services to clients of LWM, including clients and/or client accounts that LWM purchased from Lindsay. At the time of the purchase, both LWM and Lindsay were affiliated with LPL as their respective broker-dealer.

22. Following the purchase of Lindsay's book of business by LWM, LPL continued to provide broker-dealer services to Lindsay and LWM in managing the financial interests of the clients LWM had purchased from Lindsay as well as maintaining LWM's exclusive business relationship with those clients.

23. LPL knew that LWM had acquired a business relationship and expectancy with Lindsay's former clients. LPL was aware of the sale and purchase of Lindsay's clients by LWM, having both facilitated and recorded the transfer of the client accounts from Lindsay's book of business to LWM's book of business. LPL subsequently recorded and paid commissions earned on securities transactions involving Lindsay's former clients.

24. LPL knew all of the respective commissions earned on securities transaction performed on behalf of all of LWM's clients, including those who had been purchased by LWM from Lindsay, as well as the commissions earned by LWM and/or LWM's advisors on any and all securities transactions performed on behalf of LWM's clients.

Filed          24-CI-000543      01/22/2024          David L. Nicholson, Jefferson Circuit Clerk
A true copy attest      24-CI-000543      01/22/2024          /s/David L. Nicholson, Jefferson Circuit Clerk

25.     LWM hired Jonathan Upton ("**Upton**") as an employee to solicit the purchase of securities on behalf of LWM's clients, and Upton worked as a financial advisor for LWM, using the LPL platform and LWM's Branch designation, from 2008 to December 5, 2018.

26.     Upton's employment with LWM was memorialized in an agreement that was most recently revised on or about August 27, 2014, when LWM and Upton entered into a subsequent Non-Compete Representative Agreement (attached hereto as **Exhibit B**). This agreement bound Upton to non-compete, non-solicitation, and trade secret provisions.

27.     Throughout Upton's relationship with LWM, LPL recorded every securities transaction involving Upton as well as every commission he, LWM, or anyone else at LWM received as a result of that transaction.

28.     LWM hired Gregory Smith ("**Smith**") as a financial advisor to solicit and promote the purchase of securities on behalf of LWM's clients through LWM. Smith worked for LWM as a financial advisor from March 9, 2012 to December 5, 2018. Smith's employment was memorialized in a document titled "Non-Compete Representative Agreement," that was revised on or about June 9, 2015 (attached hereto as **Exhibit C**). This agreement bound Smith to non-compete, non-solicitation, and trade secret provisions.

29.     Throughout Smith's relationship with LWM, LPL recorded every securities transaction involving Smith as well as every commission he, LWM, or anyone else at LWM received as a result of that transaction.

30.     Beginning in at least December of 2017, LWM and Lamkin became concerned about its continued affiliation with LPL as its broker. These concerns grew out

7

Filed                24-CI-000543    01/22/2024        David L. Nicholson, Jefferson Circuit Clerk
A true copy attest        24-CI-000543    01/22/2024        /s/David L. Nicholson, Jefferson Circuit Clerk

of Lamkin's dissatisfaction with the way LPL handled compliance issues with another LWM advisor, Don Woods, and specifically, regarding LPL's failure to properly vet transactions on behalf of LWM clients advised by Don Woods. The situation was so problematic that Lamkin assisted these clients in their efforts to be made whole.

31.    Lamkin's actions in attempting to protect his clients from LPL's failures to properly vet transactions on behalf of clients advised by Don Woods created bad blood between LPL and LWM such that Lamkin and LWM became a target for LPL to seek to destroy and take over LWM and Lamkin's business.

32.    Because Lamkin's personal relationship with LPL was beyond repair as a result of LPL's actions, Lamkin determined that LWM and its advisors should find a different broker-dealer and utilize a different platform. Lamkin and LWM began looking for a new broker-dealer in late 2017.

33.    Unbeknownst to Lamkin and in retaliation for Lamkin's actions, LPL began a systematic, wrongful, and intentional course of action to damage Lamkin and LWM. This wrongful campaign eventually would include:

    a.  conspiring with Lindsay, Smith, and Upton to steal LWM's clients;

    b.  engaging in a witch-hunt type investigation of Lamkin intended primarily to damage Lamkin and LWM under the false pretext of protecting LPL's legitimate interests;

    c.  creating an atmosphere of fear and intimidation at LWM including causing Lindsay, Smith, and Upton to fear that their livelihoods were in jeopardy if they stayed at LWM, so as to cause Lindsay, Smith, and Upton to steal LWM's clients;

    d.  encouraging and facilitating the sudden departure of Lindsay, Smith, and Upton;

    e.  orchestrating the timing and circumstances of Lindsay, Smith, and Upton leaving LWM to cause damage to LWM that was unfair and unreasonable under the circumstances;

8

Filed                24-CI-000543    01/22/2024        David L. Nicholson, Jefferson Circuit Clerk
A true copy attest        24-CI-000543    01/22/2024        /s/David L. Nicholson, Jefferson Circuit Clerk

Filed Case 3:24-cv-00168-CHB 24-CI-000543 01/22/2024 Document 1-1 Filed 03/08/24 David L. Nicholson, Jefferson Circuit Clerk Page 11 of 52 PageID #: 15

A true copy attest  24-CI-000543  01/22/2024  /s/David L. Nicholson, Jefferson Circuit Clerk

f. providing a false narrative to Lindsay, Smith, and Upton that LWM's clients belonged to LPL, not to LWM, in order to wrongfully influence Lindsay, Smith, and Upton into acting as though they could take LWM's clients without fear of violating their contractual arrangements with LWM;

g. failing or intentionally refusing to perform basic due diligence regarding the nature of LWM's contractual arrangements with Lindsay, Smith, and Upton;

h. pretextually terminating Lamkin's relationship with LPL in order to force him to temporarily relinquish contact with LWM's clients regarding securities transactions; and

i. encouraging and facilitating the change in rep codes to facilitate the theft of LWM's clients.

34. As Lamkin and LWM were searching for a new broker-dealer, Lindsay, Smith, and Upton, with coordination, encouragement, direction, and support from LPL, were wrongfully encouraging that process despite actively preparing to steal all of LWM's business.

35. Lindsay, Smith, and Upton, with coordination, encouragement, direction, and support from LPL, were making false assurance to LWM, which caused Lamkin and LWM to continue to provide Lindsay, Smith, and Upton with specialized knowledge and expertise regarding LWM's operations and its clients.

36. Lindsay, Upton, and Smith falsely assured Lamkin that they would continue to stay on board and would stick with LWM until it switched broker-dealers.

37. After having been threatened by LPL with the sudden destruction of LWM, Smith spoke with Lamkin regarding LWM's plans to move to a different broker-dealer. At that time, he confirmed he would stay at LWM throughout the move. Upton and Lamkin had numerous conversations regarding LWM's plans to move to a different broker-dealer in which he told Lindsay that he would stay at LWM after LWM re-

9

Filed        24-CI-000543   01/22/2024        David L. Nicholson, Jefferson Circuit Clerk
A true copy attest   24-CI-000543   01/22/2024        /s/David L. Nicholson, Jefferson Circuit Clerk

structured. As a result of these false assurances, Lamkin focused LWM's energies on finding a new broker-dealer arrangement that would be ideal for LWM's business model and preparing the process of shifting LWM's affiliation to another broker-dealer.

38.     Lindsay, Smith, and Upton, with coordination, encouragement, direction, and support with LPL, lied to Lamkin regarding their intent to stay at LWM in order to wrongfully delay LWM's switch to a new broker-dealer.

39.     Lindsay, Smith, and Upton, with coordination, encouragement, direction, and support from LPL, accessed and downloaded client files and information in contemplation of leaving.

40.     Lindsay, Smith, and Upton, with coordination, encouragement, direction, and support from LPL, conducted customized searches of client data in LWM's software database and then downloaded such reports.

41.     Lindsay, Smith, and Upton, with coordination, encouragement, direction, and support from LPL, continued to draw funds from LWM as LWM paid all operational expenses, including those incurred at the behest of Lindsay, Smith, and Upton.

42.     Lindsay, Smith, and Upton, with coordination, encouragement, direction, and support from LPL, pursued their plan to steal all of LWM's clients.

43.     Lindsay, Smith, and Upton, with coordination, encouragement, direction, and support from LPL, caused LWM to transfer control of certain client accounts on a temporary basis during the time LWM and its investment advisors were transferring away from LPL, with the agreement, expectation and understanding that they were acting on behalf of LWM and its best interests at all times.

44.     Lamkin was wrongfully terminated without fair or adequate warning from his affiliation with LPL on or about August 17, 2018.

Filed        24-CI-000543   01/22/2024        David L. Nicholson, Jefferson Circuit Clerk
A true copy attest   24-CI-000543   01/22/2024        /s/David L. Nicholson, Jefferson Circuit Clerk

Filed          24-CI-000543   01/22/2024   David L. Nicholson, Jefferson Circuit Clerk
A true copy attest     24-CI-000543   01/22/2024   /s/David L. Nicholson, Jefferson Circuit Clerk

45.   Lamkin and LWM are currently affiliated with Calton & Associates ("**Calton**") as their broker-dealer. In 2019 Calton was approached by Lamkin about Calton replacing LPL Financial as his and LWM's broker-dealer. Shortly thereafter, Lamkin reached out again and indicated that LPL had terminated his relationship and wanted to accelerate discussions with Calton so that he and those working for or under him using LPL could move over together and engage Calton as their broker-dealer.

46.   At any time after Lamkin was terminated by LPL, LWM could have hired an investment advisor associated with another broker-dealer and conducted business as usual though them, or Doug Obradovich, LWM's President and a registered investment advisor, could have moved within 24 hours to another broker-dealer and handle every single LWM client.

47.   At any given point in time, LWM could have switched over any one or more of such LWM's investment advisors that were then associated with LPL as their broker-dealer to Calton as their broker-dealer. This could have been done within 24 hours and all of the accounts transferred over as well.

48.   The effect of Lamkin's termination by LPL prevented Lamkin from advising clients regarding securities or executing trades on their behalf until he could secure a new broker dealer. Lamkin's ability to advise clients with respect to annuities and insurance was not affected. The ability of other advisors working for LWM, including Lindsay, Smith, and Upton, was not affected by Lamkin's termination. After the termination, LWM retained its branch identification number.

49.   After Lamkin was wrongfully terminated by LPL, and as a result of that wrongful termination, and without relinquishing his business relationship with his clients, Lamkin referred advisory duties to other advisors still associated with LWM,

11

Filed          24-CI-000543   01/22/2024   David L. Nicholson, Jefferson Circuit Clerk
A true copy attest          24-CI-000543   01/22/2024   /s/David L. Nicholson, Jefferson Circuit Clerk

including Lindsay, Smith, and Upton. In order to properly record commissions on any securities transactions occurring between that time and when LWM and Lamkin became affiliated with another broker-dealer, the rep codes related to LWM's book of business were temporarily changed in LPL's platform to other LWM advisors.

50.     At LPL's urging and with LPL's assistance, Upton and Smith caused LWM to transfer control of certain client accounts on a temporary basis during the time LWM was transferring away from LPL, with the agreement, expectation and understanding that they were acting on behalf of LWM and its best interests at all times.

51.     LPL knew that these changes in rep code status could and would be changed back to their original status if and when LWM affiliated with another broker-dealer.

52.     LPL knew and understood that although LPL could not provide Lamkin with any client information after he was terminated, Lamkin "could take his clients back" with proper documentation after Lamkin was affiliated with another broker-dealer.

53.     LPL knew that LWM intended to stay with LPL as its broker dealer until Lamkin decided which new broker-dealer LWM and Lamkin would affiliate with.

54.     In further retaliation, LPL began looking for pretexts to damage both Lamkin and LWM. In that investigation, LPL alleged an error in the way Lamkin had filled out forms regarding reporting loans involving his then wife from a long standing (and current) client. This allegation came despite LPL's prior advice to Lamkin on how to structure this loan so that it would not need to be reported. Years later, after the wording of the disclosure form had changed, a change which Lamkin did not realize, the disclosure of this loan was allegedly required.

12

Filed          24-CI-000543   01/22/2024   David L. Nicholson, Jefferson Circuit Clerk
A true copy attest   24-CI-000543   01/22/2024   /s/David L. Nicholson, Jefferson Circuit Clerk

55. Without admitting and or denying the facts, and so as to move on from the alleged issues without incurring additional attorneys' fees, Lamkin accepted a settlement of a $7,500 fine and a 90 day sit down.

56. In further retaliation, LPL also reported Lamkin to the Commonwealth of Kentucky Department of Financial Institutions claiming that after Lamkin was terminated by LPL, he was improperly receiving commissions for trading activities in LWM's client accounts.

57. After a hearing, the hearing officer found there was no evidence to support any violations—completely vindicating Lamkin and LWM. The Department then appealed that finding and the agency remanded the matter for additional findings.

58. After LPL terminated its affiliation with Lamkin, Lindsay, Smith and Upton had numerous conversations with Lamkin in which they expressed their individual and collective intent to stay on, including a conversation between Smith and Lamkin on December 4, 2018, wherein Smith confirmed that that he would stay at LWM through affiliation with another broker-dealer.

59. Upon information and belief, LPL knew for days and/or weeks prior to their resignations/voluntary terminations that Lindsay, Smith, and Upton would end their relationship with LWM and provided no advanced notice to LWM.

60. After Lamkin was terminated by LPL, and prior to December 5, 2018, LPL, through its agents and personnel, had numerous conversations and communications with Lindsay, Smith, and Upton regarding the status of LWM.

61. In one or more of these conversations, LPL personnel told Lindsay, Upton, and Smith that they needed to get out of LWM, that they needed (and were highly

Filed          24-CI-000543   01/22/2024   David L. Nicholson, Jefferson Circuit Clerk
A true copy attest   24-CI-000543   01/22/2024   /s/David L. Nicholson, Jefferson Circuit Clerk

Filed                24-CI-000543   01/22/2024   David L. Nicholson, Jefferson Circuit Clerk
A true copy attest   24-CI-000543   01/22/2024   /s/David L. Nicholson, Jefferson Circuit Clerk

encouraged) to take client files from LWM, and that they needed to disassociate with LWM as quickly as possible.

62.     On the evening of December 5, 2018, without any advance notice, and more than 3½ years after LWM acquired Lindsay's book of business, Lindsay resigned his association with LWM and took with him all of the clients and client files that he previously sold to LWM.

63.     On the evening of December 5, 2018, without any advance notice, and after making assurances to the contrary, Smith quit LWM taking with him the clients of LWM and their files.

64.     On December 5, 2018, Upton quit LWM without notice, and after making assurances to the contrary, opened his own office, and took with him clients of LWM and their files.

65.     On December 5, 2018, LWM had total assets under management from its clients ("**AUM**") in excess of $451 million.

66.     As a result of the actions of LPL the AUM of LWM dropped to $0 the next day.

67.     Had Lamkin sold LWM's book of business in the summer of 2018 rather than relying upon LWM's agreements with Lindsay, Smith, and Upton to stay on and grow the business, LWM would have received roughly 8-10 million dollars based on commonly accepted methods of valuing a book of business. LWM could have sold its book of business to another agent or company at any time prior to December 2018. LWM did not do so because Lindsay, Smith, and Upton, with advice and encouragement from LPL, consistently advised LWM that were acting and would continue to act in LWM's interests. LWM provided training, access to its clients, client information, and methodologies to

14

Filed          24-CI-000543   01/22/2024     David L. Nicholson, Jefferson Circuit Clerk
A true copy attest     24-CI-000543   01/22/2024     /s/David L. Nicholson, Jefferson Circuit Clerk

Lindsay, Smith, and Upton only because they agreed to be bound by the restrictive covenants moving forward. (Accordingly, LWM is claiming $10,000,000.00 in compensatory damages).

## IV.   CLAIMS

### A.   Tortious Interference With A Prospective Business Advantage Regarding LWM's Securities Clients

68.   LWM restates and incorporates the allegations set forth in paragraphs 1 through 67 above.

69.   LWM had a valid business relationship or expectancy regarding its securities clients, including those securities clients it acquired when it purchased Lindsay's book of business in 2015.

70.   LWM's valid business relationship or expectancy with its clients included but was not limited to the expectancy that its clients would continue to use LWM and its advisors to provide wealth management advice and to manage their client accounts.

71.   LPL was intimately aware of this relationship or expectancy, including virtually all details regarding every securities transaction executed on behalf of those clients by LWM and any of LWM's financial advisors.

72.   LPL knew that LWM was looking to replace LPL as its broker-dealer to handle its client services, and that by conspiring with, encouraging, coercing, and/or otherwise causing Lindsay, Smith, and Upton to leave LWM before LWM got a new broker-dealer, LPL would be able to control LWM's clients and misappropriate LWM's AUM.

Filed          24-CI-000543   01/22/2024     David L. Nicholson, Jefferson Circuit Clerk
A true copy attest     24-CI-000543   01/22/2024     /s/David L. Nicholson, Jefferson Circuit Clerk

Filed         24-CI-000543   01/22/2024         David L. Nicholson, Jefferson Circuit Clerk
A true copy attest   24-CI-000543   01/22/2024         /s/David L. Nicholson, Circuit Clerk

73.    LPL intentionally interfered with LWM's business relationship or expectancy with its clients by conspiring with Lindsay, Smith, and Upton to cause LWM to lose its clients in a surprise raid.

74.    LPL put wrongful and improper pressure on Lindsay, Smith, and Upton to leave in a way that LPL knew would cause damage to LWM's relationships with LWM's clients.

75.    LPL's motive in interfering with this business relationship was improper in that it was motivated by: (1) a desire to punish Lamkin for his efforts to assist the Woods clients; (2) the possibility that LWM would move its business and advisors to find a different broker; and (3) for financial gain.

76.    The above-described actions of LPL were unfair and unreasonable under the circumstances.

77.    LPL's interference prevented LWM from entering into future contracts with its clients.

78.    But for LPL's actions, LWM would have been able to continue to service its clients and would have entered into new agreements regarding securities transactions, for a fee, on behalf of its clients.

79.    LPL knew about LWM's client relationships and wrongfully interfered with them by encouraging and enabling Lindsay, Smith, and Upton to leave in the middle of the night, despite making assurances to the contrary to LWM, *before* LWM could set up a new brokerage arrangement.

80.    But for Lindsay, Upton, and Smith concealing their plans and not acting in good faith to fulfill the terms of their respective Agreements, access to certain LWM accounts would never have been entrusted to them.

16

Case 3:24-cv-00168-CHB   Document 1-1   Filed 03/08/24   Page 19 of 52 PageID #: 23
Filed          24-CI-000543   01/22/2024      David L. Nicholson, Jefferson Circuit Clerk
A true copy attest   24-CI-000543   01/22/2024      /s/David L. Nicholson, Jefferson Circuit Clerk

81.    As a result of LPL's actions as herein described, LWM's damages are significant, including, but not limited to, the lost revenues from each of the clients set forth herein in the past and going forward.  In addition, LWM's damages include the loss in business value due to the loss of AUM.

## B.    Tortious Interference With A Prospective Business Advantage Regarding Annuities

82.    LWM restates and incorporates the allegations set forth in paragraphs 1 through 81 above.

83.    LWM had a valid business relationship or expectancy regarding its annuities clients, including those annuities clients it acquired when it purchased Lindsay's book of business in 2015.

84.    LWM's valid business relationship or expectancy with its clients included but was not limited to the expectancy that its clients would continue to use LWM and its advisors to provide wealth management advice and to manage their client accounts.

85.    LPL was intimately aware of this relationship or expectancy.

86.    LPL knew that LWM was looking to replace LPL as its broker-dealer to handle its client services, and that by conspiring with, encouraging, coercing, and/or otherwise causing Lindsay, Smith, and Upton to leave LWM before LWM got a new broker-dealer, LPL would be able to control LWM's clients and misappropriate LWM's AUM, including that portion of LWM's business that was not related to securities transactions.

87.    LPL intentionally interfered with LWM's business relationship or expectancy with its clients by conspiring with Lindsay, Smith, and Upton to cause LWM to lose its annuities clients in a surprise raid.

17

Filed          24-CI-000543    01/22/2024    David L. Nicholson, Jefferson Circuit Clerk
A true copy attest    24-CI-000543    01/22/2024    /s/David L. Nicholson, Jefferson Circuit Clerk

88.    LPL put wrongful and improper pressure on Lindsay, Smith, and Upton to leave in a way that would cause damage to LWM's relationships with LWM's annuities clients.

89.    LPL's motive in interfering with this business relationship was improper in that it was motivated by: (1) a desire to punish Lamkin for his efforts to assist the Woods clients; (2) the possibility that LWM would move its business and advisors to find a different broker; and (3) for financial gain.

90.    The above-described actions of LPL were unfair and unreasonable under the circumstances.

91.    LPL's interference prevented LWM from entering into future contracts with its clients.

92.    But for LPL's actions, LWM would have been able to continue to service its annuities clients and would have entered into new agreements regarding annuities on behalf of its clients.

93.    LPL knew about LWM's client relationships and wrongfully interfered with them by encouraging and enabling Lindsay, Smith, and Upton to leave in the middle of the night, despite making assurances to the contrary to LWM, *before* LWM could set up a new brokerage arrangement.

94.    But for Lindsay, Upton, and Smith concealing their plans and not acting in good faith to fulfill the terms of their respective Agreements, access to certain LWM accounts would never have been entrusted to them.

95.    As a result of LPL's actions as herein described, LWM's damages are significant, including, but not limited to, the lost revenues from each of the clients set

Filed          24-CI-000543    01/22/2024    David L. Nicholson, Jefferson Circuit Clerk
A true copy attest    24-CI-000543    01/22/2024    /s/David L. Nicholson, Jefferson Circuit Clerk

Case 3:24-cv-00168-CHB    Document 1-1    Filed 03/08/24    Page 21 of 52 PageID #: 25
Filed          24-CI-000543    01/22/2024    David L. Nicholson, Jefferson Circuit Clerk
A true copy attest    24-CI-000543    01/22/2024    /s/David L. Nicholson, Jefferson Circuit Clerk

forth herein in the past and going forward. In addition, LWM's damages include the loss in business value due to the loss of AUM.

### C.    **Tortious Interference With A Known Contractual Relationship Regarding Clients**

96.    LWM restates and incorporates the allegations set forth in paragraphs 1 through 95 above.

97.    LPL's actions in inducing Lindsay, Smith, and Upton to leave in the manner in which they did, prevented LWM from making future transactions on behalf of its clients.

98.    But for LPL's actions, LWM would have been able to continue to service its clients and would have entered into new agreements regarding securities transactions, for a fee, on behalf of its clients.

99.    At all relevant times, LPL had knowledge of LWM's contracts with Lindsay, Smith, and Upton.

100.    LPL had the intent of preventing LWM from performing its contracts on behalf of its clients, as it currently was through Lindsay, Smith, and Upton.

101.    LPL had a wrongful purpose under the circumstances in that LPL's wrongful intent was to have Lindsay, Smith, and Upton take clients from LWM, which would cut out Lamkin and LWM and increase LPL's profits.

102.    LPL wrongfully induced or caused LWM's clients (a third party) not to continue their business relationship with LWM.

103.    LPL enjoyed no privilege or justification for its conduct.

104.    As a result of LPL's actions as herein described, LWM's damages are significant, including, but not limited to, the lost revenues from each of the clients set

19

Filed    24-CI-000543   01/22/2024    David L. Nicholson, Jefferson Circuit Clerk

A true copy attest   24-CI-000543   01/22/2024    /s/David L. Nicholson, Jefferson Circuit Clerk

forth herein in the past and going forward. In addition, LWM's damages include the loss in business value due to the loss of AUM.

### D.   <u>Tortious Interference With A Known Contractual Relationship Regarding Financial Advisors</u>

105.   LWM restates and incorporates the allegations set forth in paragraphs 1 through 104 above.

106.   Lindsay, Smith, and Upton had a contractual business relationship with LWM.

107.   LPL induced Lindsay, Smith, and Upton to leave LWM en masse, in the middle of the night, without warning, and despite Lindsay, Smith, and Upton having made assurances to LWM that they would not leave.

108.   LPL induced Lindsay, Smith, and Upton, to end their business relationship with LWM for reasons that were wrongful under the circumstances.

109.   As a result of LPL's actions as herein described, LWM's damages are significant, including, but not limited to, the lost revenues from each of the clients set forth herein in the past and going forward. In addition, LWM's damages include the loss in business value due to the loss of AUM.

### V.   RELIEF SOUGHT

As a result of the conduct set forth above, Plaintiffs Lamkin Wealth Management, LLC and Louisville Wealth Management, LLC, request a final hearing on this matter to take place in Louisville, Kentucky, that a decision be rendered against LPL Financial, and that this Court grants Plaintiffs the following relief:

(a)   Damages based on fairness and equity not to exceed $10,000,000.00;

(b)   For pre-judgment and post-judgment interest on those damages at the prevailing legal rate;

Filed    24-CI-000543   01/22/2024    David L. Nicholson, Jefferson Circuit Clerk

A true copy attest   24-CI-000543   01/22/2024    /s/David L. Nicholson, Jefferson Circuit Clerk

Filed                     24-CI-000543    01/22/2024       David L. Nicholson, Jefferson Circuit Clerk
A true copy attest        24-CI-000543    01/22/2024       /s/David L. Nicholson, Jefferson Circuit Clerk

(c)     For any other compensatory damages that Plaintiff LWM may suffer as a
        result of Defendant's conduct, as applicable, and prejudgment interest on
        all such damages;

(d)     For punitive damages in an amount 10,000,000.00;

(e)     For attorney fees and costs; and

(f)     For all other relief to which Plaintiff may appear entitled.

Respectfully submitted,

_/s/ John D. Cox_
John D. Cox
Scott D. Spiegel
Lynch, Cox, Gilman & Goodman, PSC
500 West Jefferson Street, Suite 2100
Louisville, Kentucky 40202
(502) 589.4215 *phone*
jcox@lynchcox.com
sspiegel@lynchcox.com
**_Counsel for Plaintiffs_**

21

Filed    Case 3:24-cv-00168-CHB   Document 1-1   Filed 03/08/24   Page 24 of 52 PageID #: 28
24-CI-000543   01/22/2024   David L. Nicholson, Jefferson Circuit Clerk

A true copy attest    24-CI-000543   01/22/2024    /s/David L. Nicholson, Jefferson Circuit Clerk

# EXHIBIT A

Filed                 24-CI-000543   01/22/2024        David L. Nicholson, Jefferson Circuit Clerk
A true copy attest   24-CI-000543   01/22/2024        /s/David L. Nicholson, Jefferson Circuit Clerk

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT is entered into and effective as of February __, 2015 (the "Effective Date"), by and between LAMKIN WEALTH MANAGEMENT, LLC, a Kentucky limited liability company ("Buyer"), and BRUCE LINDSAY, an individual resident of the Commonwealth of Kentucky ("Seller").

### RECITALS:

**A.** Seller owns and operates a financial advisory business ("Seller's Business") that is supported by LPL Financial Services, Inc. ("LPL").

**B.** Buyer is also supported by LPL and provides wealth management services and financial advisory services, including wealth planning, trust services, estate planning, risk management planning, and small business planning (collectively, "Buyer's Business").

**C.** Buyer desires to purchase from Seller, and Seller desires to sell to Buyer, the intangible assets associated with Seller's business.

### AGREEMENT:

NOW, THEREFORE, the parties hereby agree as follows:

**1.** **DEFINITION OF CERTAIN TERMS.** In addition to the terms defined in this Agreement, certain other terms used in this Agreement are defined in Exhibit A, and, when used herein, shall have the meaning set forth in Exhibit A.

**2.** **PURCHASE AND SALE OF ASSETS.**

**2.1** **Purchase and Sale.** Upon the terms and subject to the conditions of this Agreement, at the Closing on the Closing Date, Seller shall sell, transfer, convey, assign and deliver to Buyer, and Buyer shall purchase and acquire from Seller, free and clear of all Encumbrances, all of Seller's right, title and interest in and to the Acquisition Assets for (a) an aggregate purchase price of $513,000. The purchase and sale of the Acquisition Assets is referred to in this Agreement as the "Acquisition".

**2.2** **Acquisition Assets.** The term "Acquisition Assets" shall mean all rights, title and interest in and to client accounts, client lists, client files, any contract rights related thereto and all goodwill associated therewith related to Seller's Business, including the current list of clients set forth on Schedule 2.2 (the "Client List").

**2.3** **Retained Liabilities.** Buyer shall not assume, and Seller shall remain solely responsible for and shall retain, pay, perform and discharge, any and all Liabilities of Seller or Seller's Business arising out of, or related to, Seller's Business on or before the Closing Date, whether such liabilities are known, unknown, contingent, executory, fixed or otherwise

Filed                 24-CI-000543   01/22/2024        David L. Nicholson, Jefferson Circuit Clerk
A true copy attest   24-CI-000543   01/22/2024        /s/David L. Nicholson, Jefferson Circuit Clerk

Filed          24-CI-000543   01/22/2024                    David L. Nicholson, Jefferson Circuit Clerk
A true copy attest   24-CI-000543   01/22/2024          /s/David L. Nicholson, Jefferson Circuit Clerk

## 3.   CLOSING; POST-CLOSING PAYMENT.

**3.1   *Closing.*** Consummation of the Acquisition (the "Closing") shall take place at Buyer's office, 901 Lily Creek Road, Suite 102, Louisville, KY 40243at 10:00 a.m. (local time), or at such other place and time as the parties may mutually agree upon, on February ___, 2015 (the "Closing Date").

**3.2   *Closing Deliveries.*** At the Closing, (a) Buyer shall deliver to Seller immediately available funds in an amount equal to $200,000 and (b) Seller shall deliver to Buyer such documents as Buyer or its counsel may reasonably request to demonstrate satisfaction of the conditions and compliance with the agreements set forth in this Agreement.

**3.3   *Post-Closing Payments.***

    **(a)** On August 31, 2015, Buyer shall deliver to Seller immediately available funds in an amount equal to $150,000.

    **(b)** On August 31, 2016, Buyer shall deliver to Seller immediately available funds in an amount equal to $163,000.

    **(c)** On August 31, 2016, if more than 95% of the number of clients listed on the Client List have become a client of Buyer, Buyer shall deliver to Seller immediately available funds in an amount equal to $10,000.

4.   **REPRESENTATIONS AND WARRANTIES OF SELLER.** Seller hereby represent and warrant to Buyer as follows:

**4.1   *Organizational Status.*** Seller operates Seller's Business individually and does not conduct any activities related to Seller's Business through a Person affiliated with Seller.

**4.2   *Financial Statements.*** Seller has made available to Buyer the unaudited consolidated statements of income of Seller's Business for the years ending December 31, 2013 and 2014, and a Year-to-Date Commission Summary as of December 31, 2014, prepared by LPL (collectively, the "Seller Financial Statements"). The Seller Financial Statements fairly present in all material respects the financial position and the results of operations of Seller's Business. The Seller Financial Statements have been prepared from and are in accordance with the books and records of Sellers and the Business, and, in all material respects, accurately set forth and disclose all financial transactions of Sellers relating to the Business for the periods noted therein.

**4.3   *Permits.*** Schedule 4.3 lists all certificates, licenses, permits, authorizations and approvals held by Seller (the "Seller Permits"). The Seller Permits are all permits required to be held by Seller to conduct Seller's Business as currently conducted. All Seller Permits are validly held by Seller, and Seller has complied in all material respects with all terms and conditions thereof. Seller has not received notice of any Proceedings relating to the revocation or modification or any Seller Permits.

15856779.3

-2-

Filed          24-CI-000543   01/22/2024                    David L. Nicholson, Jefferson Circuit Clerk
A true copy attest   24-CI-000543   01/22/2024          /s/David L. Nicholson, Jefferson Circuit Clerk

Case 3:24-cv-00168-CHB Document 1-1 Filed 03/08/24 Page 27 of 52 PageID #: 31
Filed       24-CI-000543   01/22/2024   David L. Nicholson, Jefferson Circuit Clerk
A true copy attest   24-CI-000543   01/22/2024   /s/David L. Nicholson, Jefferson Circuit Clerk

### 4.4    Consents; Enforcement: Noncontravention; Noncompetes.

(a)    **Consents.** No consent, approval, action or authorization of any Person, including any Governmental Authorization or application to, or other notice or filing with, any Governmental Body, is required for the execution, delivery or performance of this Agreement by the Seller.

(b)    **Enforcement.** This Agreement has been duly executed and delivered by Seller and constitutes the legal, valid and binding obligations of Seller, enforceable in accordance with its terms.

(c)    **Noncontravention.** Neither the execution and the delivery of this Agreement, nor compliance with, or fulfillment of, the terms, conditions and provisions hereof, will (1) violate any Legal Requirement of Seller; (2) conflict with, result in a breach of, or constitute a default under, any Contract or Order to which Seller is bound; (3) result in the imposition of or creation of any Encumbrance upon or with respect to any of the Acquisition Assets; (4) require any notice under any Contract or Order to which Seller is bound or to which any of Seller's assets or properties are subject; or (5) require the approval, consent, authorization or act of, or the making by, Seller of any declaration, filing or registration with, any Person.

(d)    **Restriction on Competition.** Seller is not bound or subject to any contract, arrangement or commitment containing covenants by Seller prohibiting or restricting competition in any line of business or activity or restricting the customers from whom, or the area in which, Seller may solicit or conduct business.

### 4.5    Books and Records. Seller's books and records are true and complete in all material respects and have been prepared in the usual and customary manner in accordance with reasonable commercial practices for companies engaged in businesses similar to Seller's Business, including the maintenance of an adequate system of internal controls.

### 4.6    Compliance with Legal Requirements. Seller's Business is, and, at all times since its inception has been, in material compliance with each Legal Requirement that is or was applicable to it or to the conduct or operation of Seller's Business or the ownership or use of any of the Acquisition Assets. Seller has not (a) committed or been convicted of any, or pled guilty or nolo contendere (or any similar plea or admission) to, a felony or a criminal act involving dishonesty or other moral turpitude, (b) been adjudicated bankrupt or insolvent according to law or made an assignment on behalf of creditors or (c) had a complaint filed against him with any Governmental Body related to Seller's Business.

### 4.7    Customers of Seller; Conditions Affecting Seller. Schedule 4.7 sets forth the 30 largest customers of Seller by dollar value of aggregate fees over the 24 months ending December 31, 2014, and the amount of such fees. None of the customers identified on Schedule 4.7 have terminated their relationship with Seller or otherwise ceased doing business with Seller, or to the knowledge of Seller, has otherwise indicated to Seller that the amount of revenue accounted for by such customer is likely to be materially less after the Closing Date than the amount reflected for such customers on Schedule 4.7. Seller has no reason to anticipate that the amount of revenue or gross margin related to such customer is likely to be materially less in

15856779.3                                                        -3-

Filed       24-CI-000543   01/22/2024          David L. Nicholson, Jefferson Circuit Clerk
A true copy attest   24-CI-000543   01/22/2024          /s/David L. Nicholson, Jefferson Circuit Clerk

Filed          24-CI-000543   01/22/2024        David L. Nicholson, Jefferson Circuit Clerk
A true copy attest   24-CI-000543   01/22/2024        /s/David L. Nicholson, Jefferson Circuit Clerk

the 24-month period immediately succeeding the Closing Date than the amount reflected for such customers on Schedule 4.7, other than as may be caused by general economic or political conditions, conditions generally affecting the Sellers' industry, acts of war or acts of God.

   **4.8** *Completeness of Statement; Effect of Representations and Warranties.* Seller has disclosed to Buyer in separate writings or in the Schedules, all material adverse facts known to Seller relating to the representations and warranties. The representations and warranties of Seller in this Agreement, as qualified by the disclosures made on the Schedules, are true and complete in all material respects. No representation or warranty of Seller in this Agreement, as qualified by the disclosures made on the Schedules, contains any untrue statement of a material fact, omits any material fact necessary to make such representation or warranty, under the circumstances which it was made, not misleading, or contains any misstatement of a material fact.

   **5.** **RESTRICTIVE COVENANTS OF SELLER.**

   **5.1** *Nonsolicitation of Customers and Clients.*

   *(a)* Seller shall not, individually or on behalf of any other Person, directly or indirectly solicit or divert any business, activity, or service related to Buyer's Business from any Person on the Client List or from any Person who is or was an actual, potential, or prospective customer or client of Buyer after the date of this Agreement or during the period that Seller is engaged by Buyer to provide services (each a "Buyer Client").

   *(b)* With respect to each Buyer Client, if Seller breaches the covenants in this Section 5.1, Seller shall pay to Buyer as liquidated damages an amount equal to the product of (a) three multiplied by (b) the amount of net fee revenue generated by such Buyer Client as reported by LPL for any 12-month period selected by Buyer in its sole discretion (or if such Buyer Client has not had an account serviced through LPL for at least 12 months, the actual net revenue generated by such Buyer Client shall be annualized). Such liquidated damages shall be due and payable immediately upon the occurrence of such breach. Seller acknowledges and agrees that Buyer may set off such liquidated damages against any amounts due to Seller from Buyer. Buyer and Seller agree that the foregoing liquidated damages are a reasonable estimate of the damages Buyer would incur as a result of such violations and that such liquidated damages do not constitute a penalty. Buyer's pursuit or recovery of liquidated damages shall not affect the Buyer's rights to seek and obtain equitable or injunctive relief, and Seller agrees that such remedies are cumulative.

   **5.2** *Nonsolicitation of Employees, Agents, and Others.* Seller shall not, individually or on behalf of any other Person, directly or indirectly recruit, hire, or engage any Person who was an employee, consultant, sales representative, agent, or independent contractor of Buyer at any time during the period that Seller is engaged by Buyer to provide services, or entice or induce any of the foregoing, to work with, or otherwise provide services to, Seller or any employer, partner, or other affiliate of Seller.

   **5.3** *Effective Period of Covenants.* The obligations in Section 5.1 and Section 5.2 shall be referred to collectively as the "Covenants". The Covenants shall begin

Filed          24-CI-000543   01/22/2024        David L. Nicholson, Jefferson Circuit Clerk
A true copy attest   24-CI-000543   01/22/2024        /s/David L. Nicholson, Jefferson Circuit Clerk

Case 3:24-cv-00168-CHB    Document 1-1    Filed 03/08/24    Page 29 of 52 PageID #: 33
Filed                24-CI-000543    01/22/2024        David L. Nicholson, Jefferson Circuit Clerk
A true copy attest    24-CI-000543    01/22/2024        /s/David L. Nicholson, Jefferson Circuit Clerk

immediately on the Closing Date and shall continue until the later of: (a) five years after the date of this Agreement or (b) three years after Seller is not engaged by Buyer to provide services.

**5.4    Reasonableness.** Seller agrees that the Covenants are fair and reasonable in their scope and duration for the reasons set forth above. Seller agrees that he shall not dispute the scope or duration of any Covenant in any proceeding to enforce such Covenant. Seller understands and agrees that the Covenants may impose obligations on Seller; however, Seller has nevertheless decided to accept this Agreement and these obligations in order to receive the benefits contained in this Agreement.

**5.5    Notification.** Seller hereby authorizes Buyer to notify any Persons of the terms of this Agreement and Seller's responsibility under this Agreement. Seller further agrees that, in the event he engages in any activity that even arguably could violate the terms of this Agreement, he shall immediately notify Buyer.

**5.6    Remedies.** Seller understands and agrees that, if he breaches any Covenant, Buyer may not be adequately compensated by damages. Therefore, in the event Seller breaches any Covenant, Buyer shall, in addition to all other remedies, including actions for damages, be entitled to injunctive relief and specific performance. Nothing herein contained will be construed as prohibiting Buyer from pursuing any other remedies available to it for such breach or threatened breach, including, without limitation, the recovery of monetary damages, and it shall also be entitled to the payment of any and all reasonable fees, disbursements, and other charges of attorneys and collection agents, court costs, and all other costs of enforcement of this Agreement. Seller hereby intentionally and affirmatively waives the requirement that Buyer post any bond, demonstrate the likelihood of irreparable damage, or demonstrate that any actual damages will be suffered by Buyer seeking enforcement hereof as a result of Seller's breach of any Covenant.

**5.7    Attorneys' Fees.** If any action at law or in equity is necessary to enforce the terms of this Agreement, the prevailing party shall be entitled to reasonable attorney's fees, costs and expenses in addition to any other relief to which such prevailing party may be entitled. If a court enforces this Agreement but reduces the scope of the Covenants beyond the scope set forth in this Agreement, no Party shall be considered the "prevailing party" for the purposes of this Section.

**5.8    Severability.** The Covenants shall be construed as separate covenants and agreements, and if any court shall finally determine that the restraints provided for in the Covenants are too broad as to the area, activity, or time covered, said area, activity, or time covered shall be reduced to whatever extent the court deems reasonable to the maximum extent permitted by law, and such Covenants shall be enforced as to such reduced area, activity, or time. The invalidity or unenforceability of any provision hereof shall not affect the validity or enforceability of any other provision hereof.

**5.9    Tolling.** The time periods referenced in this Agreement shall exclude any time during which Seller is in violation of any Covenant and any time during which there is pending in any court of competent jurisdiction any action brought by any Person, in which Buyer

15856779.3                                        -5-

Filed                24-CI-000543    01/22/2024        David L. Nicholson, Jefferson Circuit Clerk
A true copy attest    24-CI-000543    01/22/2024        /s/David L. Nicholson, Jefferson Circuit Clerk

Filed   Case 3:24-cv-00168-CHB   Document 1-1   Filed 03/08/24   Page 30 of 52 PageID #: 34
24-CI-000543   01/22/2024   David L. Nicholson, Jefferson Circuit Clerk
A true copy attest   24-CI-000543   01/22/2024   /s/David L. Nicholson, Jefferson Circuit Clerk

seeks to enforce any Covenant or in which any Person contests the validity of any Covenant or its enforceability or seeks to avoid its performance or enforcement.

### 6.   ADDITIONAL COVENANTS.

**6.1   Transition of the Business.** The parties shall cooperate with each other to effect the smooth transition of the control and operation of Seller's Business from Seller to Buyer, as contemplated herein, including the retention of the customers of Seller's Business, by such means that each party may reasonably request. Seller shall cooperate with Buyer in providing all information required hereunder and access thereto and whatever is reasonably required to carry out the purposes and intent of the Acquisition.

**6.2   Services.**

(a)   After the Closing Date, Buyer shall engage Seller as an independent contractor to provide, on behalf of Buyer, financial consulting services substantially similar to those provided in Seller's Business to clients of Buyer, including those listed on the Client List. Seller may choose in his sole discretion the amount of such services to perform. Buyer may terminate Seller's services for "Cause" at any time. For "Cause" termination shall mean the occurrence of any of the following:

(1)   Seller has been negligent in the performance of his duties (including failure to work on a full-time basis), has been made aware of such negligence, and (if the effects of such negligence are curable) has failed to fully cure the effects thereof within such reasonable period of time as the Company may designate;

(2)   Seller has breached any provision of this Agreement, has been made aware of such breach, and (if the effects of such breach are curable) has failed to fully cure the effects thereof within such reasonable period of time as the Company may designate;

(3)   Seller has abused alcohol or drugs;

(4)   Seller has engaged in fraud, embezzlement, theft, dishonesty, willful misconduct or deliberate injury to the Company or its affiliates or customers, suppliers or employees; or

(5)   Seller has been convicted of a felony or any act of moral turpitude.

(b)   Notwithstanding anything in Section 6.2(a) to the contrary, for the clients listed on Schedule 6.2(b) (the "Preferred Client List"), Seller agrees to serve as such clients full-time financial advisor. In exchange for such commitment, subject to Section 6.2(e), Buyer shall pay to Seller an amount equal to 50% of the net payout reported by LPL that is generated by such clients for the period beginning on the Closing Date and ending on the later of (1) if Seller's services are terminated by Buyer for a reason other than for Cause, three years after the date of this Agreement or (2) the date that Seller is no longer engaged by Buyer to provide services. If Buyer determines in its reasonable discretion that Seller is no longer serving

15856779.3

-6-

Filed            24-CI-000543   01/22/2024        David L. Nicholson, Jefferson Circuit Clerk
A true copy attest   24-CI-000543   01/22/2024        /s/David L. Nicholson, Jefferson Circuit Clerk

full-time financial advisor services to a client on the Preferred Client List, Buyer may send notice to Seller that after the date of such notice Seller shall be compensated pursuant to Section 6.2(d) with respect to such client.

(c) For all new clients of Buyer generated by Seller that are not referrals from any client listed on the Client List, Buyer shall pay to Seller an amount equal to 50% of the net payout reported by LPL that is generated by such clients during the period that Buyer engages Seller to provide services on behalf of Seller.

(d) For all clients of Buyer other than those identified in Section 6.2(b) or Section 6.2(c) to which Seller provides services as the primary financial advisor after the date of this Agreement, Buyer shall pay to Seller an amount equal to 35% of the net payout reported by LPL that is generated by such clients during the period that Buyer engages Seller to provide services on behalf of Seller.

(e) Notwithstanding anything to the contrary in this Section 6.2, no fees under this Section 6.2 shall accrue on Seller's behalf with respect to any client identified on the Client List, and Buyer shall not obligated to pay to Seller any fees with respect to any client identified on the Client List, until the aggregate amount of net payout received by Buyer from LPL with respect to the clients identified on the Client List exceed the Purchase Price.

(f) Seller shall maintain, at Buyer's expense, all Seller Permits during the period that Seller is providing financial advisory services on behalf of Buyer.

(g) Seller may conduct the services described in this Section 6.2 at the location at which Seller was conducting Seller's business immediately preceding the Closing, which shall location shall be a deemed a non-OSJ office. Until notified by Buyer, Seller shall maintain all books and records of the clients on the Client List and any prior clients of Seller at such location.

**6.3** **Expenses.** After the Closing Date, Buyer shall be responsible for and pay all reasonable ordinary operating expenses incurred by Seller in the performance of services on behalf of Buyer, including registration fees, licenses, E&O insurance premiums, Branchnet use, laptop computer for business use, office supplies, U4 updates, and LPL administrative costs. Notwithstanding anything in the immediately preceding sentence to the contrary, (a) Seller shall obtain prior approval from Buyer for any expense for which Seller shall seek reimbursement that exceeds $500 and (b) Buyer shall not be required to pay for or reimburse Seller for any expenses related to operating out of Seller's residence or other satellite office.

**7.** **INDEMNIFICATION; REMEDIES.**

**7.1** **Survival.** All representations, warranties, covenants and obligations in this Agreement, the Schedules and any other certificate or document delivered pursuant to this Agreement shall survive the Closing.

**7.2** **Indemnification and Payment of Damages by Seller.** Seller shall indemnify and hold Buyer and its directors, officers, shareholders or managers, officers, members, Affiliates and successors and assigns ("Buyer Indemnitees") harmless from, and shall

15856779.3                                    -7-

Filed            24-CI-000543   01/22/2024        David L. Nicholson, Jefferson Circuit Clerk
A true copy attest   24-CI-000543   01/22/2024        /s/David L. Nicholson, Jefferson Circuit Clerk

Case 3:24-cv-00168-CHB  Document 1-1  Filed 03/08/24  Page 32 of 52 PageID #: 36
Filed            24-CI-000543    01/22/2024    David L. Nicholson, Jefferson Circuit Clerk
A true copy attest    24-CI-000543    01/22/2024    /s/David L. Nicholson, Jefferson Circuit Clerk

pay to the Buyer Indemnitees the amount of, all losses, damages, claims, costs, expenses, including attorney's fees, and other liabilities (collectively, "Losses") arising, directly or indirectly, from or in connection with:

*(a)*    any breach of any representation or warranty made by Seller in this Agreement;

*(b)*    any breach by Seller of any covenant, agreement or obligation of Seller in this Agreement; and

*(c)*    any Liability arising out of the ownership or operation of Seller's Business prior to the Closing Date.

**7.3    *Right of Setoff.*** Buyer may set off any amount to which it may be entitled under this Section 7 for losses that have been finally determined either through mutual agreement between Seller and Buyer or by a court of competent jurisdiction against amounts otherwise payable under this Agreement. Neither the exercise of nor the failure to exercise such right of setoff will constitute an election of remedies or limit Buyer in any manner in the enforcement of any other remedies that may be available to it.

## 8.    MISCELLANEOUS PROVISIONS.

**8.1    *Amendment; Waiver.*** This Agreement and the Schedules hereto, may be amended, modified or superseded only by a written instrument signed by all of the parties to this Agreement. No party shall be deemed to have waived compliance by another party of any provision of this Agreement unless such waiver is contained in a written instrument signed by the waiving party and no waiver that may be given by a party will be applicable except in the specific instance for which it is given. The failure of any party to enforce at any time any of the provisions of this Agreement or to exercise any right or option contained in this Agreement or to require at any time performance of any of the provisions of this Agreement, by any of the other parties shall not be construed to be a waiver of such provisions and shall not affect the validity of this Agreement or any of its provisions or the right of such party thereafter to enforce each provision of this Agreement. No course of dealing shall operate as a waiver or modification of any provision of this Agreement or otherwise prejudice such party's rights, powers and remedies.

**8.2    *Confidentiality of Agreement.*** Unless otherwise required by law, no party shall disclose the terms of this Agreement to any Person other than a party's counsel and its other representatives or such other third parties with whom it must communicate to consummate the transactions described in this Agreement.

**8.3    *Construction and Interpretation of Agreement.***

*(a)*    Section titles or captions in this Agreement are included for purposes of convenience only and shall not be considered a part of the Agreement in construing or interpreting any of its provisions. All references in this Agreement to Sections shall refer to Sections of this Agreement unless the context clearly otherwise requires.

**(b)** When used in this Agreement, the word "including" shall have its normal common meaning and any list of items that may follow such word shall not be deemed to represent a complete list of the contents of the referent of the subject.

**(c)** The parties have participated jointly in the negotiation and drafting of this Agreement. If any ambiguity or question of intent or interpretation arises, no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

**(d)** The parties do not intend that this Agreement shall confer on any third party any right, remedy or benefit or that any third party shall have any right to enforce any provision of this Agreement.

**8.4    *Counterparts*.** This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original copy of this Agreement and all of which, when taken together, shall be deemed to constitute one and the same agreement.

**8.5    *Entire Agreement*.** This Agreement and the Schedules embody the entire agreement and understanding of the parties related to its subject matter and supersedes all prior proposals, understandings, agreements, correspondence, arrangements and contemporaneous oral agreements relating to the subject matter of this Agreement. No representation, promise, inducement or statement of intention has been made by any party which has not been embodied in this Agreement.

**8.6    *Exclusive Forum*.** Any action to enforce any provision of this Agreement shall be instituted exclusively in the United States District Court for the Western District of Kentucky or, if such Court does not have jurisdiction to adjudicate such action, in the courts of the Commonwealth of Kentucky located in Jefferson County, Kentucky. The parties irrevocably and unconditionally waive, to the fullest extent permitted by law, and shall not plead any objection that they may now or hereafter have to the jurisdiction of such courts over the parties, the laying of venue or the convenience of the forum of any action related to this Agreement that is brought in such courts.

**8.7    *Schedules*.** All Schedules to this Agreement, if any, shall constitute part of this Agreement and shall be deemed to be incorporated in this Agreement by reference and made a part of this Agreement as if set out in full at the point where first mentioned.

**8.8    *Expenses*.** Except as otherwise expressly provided for in this Agreement, each party will bear its own expenses incurred in connection with the preparation, execution and performance of its obligations under this Agreement, including all fees and expenses of agents, representatives, counsel and accountants.

**8.9    *Further Assurances*.** Each party shall execute and deliver such additional documents or take such additional actions as may be requested by another party to this Agreement if such requested document or action is reasonably necessary to effect the transactions described in this Agreement.

15856779.3

-9-

**8.10    Governing Law.** This Agreement shall be governed by, and shall be construed and enforced in accordance with, the laws of the Commonwealth of Kentucky, without giving effect to any conflict of law rule or principle of such state.

**8.11    Independent Contractor Relationship.** Regarding all matters relating to this Agreement, this Agreement creates an independent contractor relationship among the parties. Nothing contained in this Agreement shall be construed to (a) give any party the power to direct and control the day-to-day activities of the other; (b) constitute the parties as partners, joint venturers, co-owners or otherwise as participants in a joint or common undertaking; or (c) constitute any party, its agents or employees as employees of any other party or grant any of them the power or authority to act for, bind or otherwise create or assume any obligation on behalf of any of the other parties for any purpose whatever.

**8.12    Notices.** All notices, requests, consents, approvals, waivers, demands and other communications required or permitted to be given or made under this Agreement shall be in writing and shall be deemed delivered to the parties on the (a) date of personal delivery or confirmed transmission by facsimile transmission; (b) second Business Day following the date of delivery to a nationally recognized overnight courier service; or (c) third Business Day following the date of deposit in the United States Mail, postage prepaid, by certified mail, in each case, addressed as follows, or to such other address, Person or entity as any party may designate by notice to the others in accordance herewith:

If to Buyer:                  Lamkin Wealth Management, LLC
                              901 Lily Creek Rd
                              Suite 102
                              Louisville, KY 40243
                              Attention: Mark T. Lamkin

With a copy to:               Bingham Greenebaum Doll LLP
                              3500 National City Tower
                              101 South Fifth Street
                              Louisville, KY 40202
                              Attention: Brian D. Zoeller

If Seller:                    Bruce Lindsay

**8.13    Severability of Provisions.** If a court in any Proceeding holds any provision of this Agreement or its application to any Person or circumstance invalid, illegal or unenforceable, the remainder of this Agreement, or the application of such provision to Persons or circumstances other than those to which it was held to be invalid, illegal or unenforceable, shall not be affected and shall be valid, legal and enforceable to the fullest extent permitted by law, but only if and to the extent such enforcement would not materially and adversely frustrate the parties' essential objectives as expressed in this Agreement. Furthermore, in lieu of any such invalid or unenforceable term or provision, the parties intend that the court add to this Agreement

a provision as similar in terms to such invalid or unenforceable provision as may be valid and enforceable, so as to effect the original intent of the parties to the greatest extent possible.

    **8.14**   *Time of Essence.*   Time is of the essence to the performance of the obligations set forth in this Agreement.

[Signature Page Follow]

Filed                24-CI-000543   01/22/2024      David L. Nicholson, Jefferson Circuit Clerk
A true copy attest   24-CI-000543   01/22/2024      /s/David L. Nicholson, Jefferson Circuit Clerk

IN WITNESS WHEREOF, the parties have entered into this Agreement as of the date first written above.

BRUCE LINDSAY

Date:   $2-17-2015$

LAMKIN WEALTH MANAGEMENT, LLC

By: 

Mark T. Lamkin, CEO

Date:  $2/17/15$

Filed                24-CI-000543   01/22/2024      David L. Nicholson, Jefferson Circuit Clerk
A true copy attest   24-CI-000543   01/22/2024      /s/David L. Nicholson, Jefferson Circuit Clerk

Filed            24-CI-000543   01/22/2024        David L. Nicholson, Jefferson Circuit Clerk
A true copy attest   24-CI-000543   01/22/2024        /s/David L. Nicholson, Jefferson Circuit Clerk

## EXHIBIT A
## DEFINED TERMS

*"Affiliate"* means (1) a Person that, directly or indirectly, through one or more intermediaries, controls or is controlled by, or is controlled by a Person that controls, such Person; (2) any trust or estate in which such Person has a beneficial interest or as to which such Person serves as a trustee or in another fiduciary capacity; or (3) any spouse, parent or lineal descendent of such Person. As used in this Agreement, "control" means possession, directly or indirectly, of the power to direct or cause the direction of management or policies, whether through ownership of securities, partnership or other ownership interests, by contract or otherwise.

*"Encumbrance"* means any charge, claim, community property, mortgage, deed of trust, easement, become leasehold interest, right of way interest, condition, equitable interest, lien, option, pledge, right of refusal, security interest or any other right or restriction of any kind.

*"Governmental Authorizations"* means any approval, consent, license, permit, waiver or other authorization issued, granted, given or otherwise made available by or under the authority of any Governmental Body or pursuant to any Legal Requirement.

*"Governmental Body"* means any (1) nation, state, county, city, town, village, district or other jurisdiction of any nature; (2) federal, state, local, municipal, foreign or other governmental organization or body; (3) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official or entity and any court or other tribunal); (4) multi-national organization or body; or (5) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power of any nature.

*"IRC"* means the Internal Revenue Code of 1986, as amended.

*"IRS"* means the Internal Revenue Service.

*"Legal Requirement"* means any applicable federal, state, local, municipal, foreign, international, multinational or other administrative Order, constitution, law, ordinance, principle of common law, regulation, statute or treaty.

*"Liabilities"* means any claim, obligation, expense or cost whether fixed, contingent, matured, unmatured, known or unknown, accrued or unaccrued.

*"Order"* means any award, decision, injunction, judgment, unit, decree, subpoena or verdict entered, issued, made or rendered by any court administration agency or other Governmental Body or by any arbitrator.

*"Person"* means any individual, corporation, partnership, firm, joint venture, association, joint-stock company, trust, unincorporated organization, governmental or regulatory body or other entity.

Filed            24-CI-000543   01/22/2024        David L. Nicholson, Jefferson Circuit Clerk
A true copy attest   24-CI-000543   01/22/2024        /s/David L. Nicholson, Jefferson Circuit Clerk

Filed          24-CI-000543    01/22/2024        David L. Nicholson, Jefferson Circuit Clerk
A true copy attest    24-CI-000543    01/22/2024        /s/David L. Nicholson, Jefferson Circuit Clerk

*"Proceeding"* means any action, arbitration, audit, hearing, investigation, litigation or suit (whether civil, criminal, administrative, investigative or informal) commenced, brought, conducted or heard by or before, or otherwise involving, a Governmental Body or arbitrator.

*"Schedules"* mean the disclosure schedules attached to this Agreement.

# **EXHIBIT B**

Filed          24-CI-000543    01/22/2024    David L. Nicholson, Jefferson Circuit Clerk

A true copy attest    24-CI-000543    01/22/2024    /s/David L. Nicholson, Jefferson Circuit Clerk



**Lamkin Wealth Management**

# Non-Compete Representative Agreement

THIS AGREEMENT is made this 27th day of _August_, 2014, by and between **Lamkin Wealth Management**, and _Jonathan Upton_, an at-will Independent Contractor or Employee Advisor, as the case may be, hereinafter "Advisor".

### WITNESSETH:

WHEREAS, **Lamkin Wealth Management** has invested substantial time, effort, and money in the development of its trade secrets, business practices, and other confidential and proprietary information which has enabled **Lamkin Wealth Management** to compete successfully in its business, and the disclosure of such secrets, practices, or information would be greatly damaging to **Lamkin Wealth Management** and the continued success of its business; and

WHEREAS, during the course of Advisor's contractor services, **Lamkin Wealth Management**'s has and will disclose to Advisor knowledge concerning its clients, trade secrets, business practices, and other specific confidential and proprietary information, all of which constitute the property of **Lamkin Wealth Management**.

NOW, THEREFORE, consistent with the above Recitals, which are hereby incorporated in this Agreement by this reference, and in consideration of **Lamkin Wealth Management** continued employment of, or use of Advisor's services, as the case may be, and to induce **Lamkin Wealth Management** to continue Advisor's services, and to allow Advisor to have access to and use of **Lamkin Wealth Management**'s confidential and proprietary information, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, **Lamkin Wealth Management**} and Advisor hereby agree as follows:

1. **Nondisclosure of Confidential Information.**

a.        *Access.* Advisor acknowledges that during its services on behalf of **Lamkin Wealth Management**, Advisor will have with **Lamkin Wealth Management** exposure to, familiarity with, and opportunity to learn highly sensitive, confidential, and proprietary information of **Lamkin Wealth Management** and its clients, which may include, without limitation, information about services, referral sources, clients and prospective clients, vendors and suppliers, various investment products, pricing, billing and collection procedures, proprietary software and the source code thereof, financial and accounting data, audit reports, personnel and compensation, data processing and communications, technical data, marketing strategies, training materials, policy and procedural manuals and bulletins, specific know-how regarding the business of **Lamkin Wealth Management** and its products and services, and personal and business information of clients, including, but not limited to, names, addresses, telephone numbers, assets and debts, loans, deposit accounts, balances, credit ratings, experiences, or information concerning any other transaction with **Lamkin Wealth Management** (collectively referred to herein as "Confidential Information").

b.        *Valuable Asset.* Advisor further acknowledges that the Confidential Information is a valuable, special, and unique asset of **Lamkin Wealth Management**, such that the unauthorized disclosure or use by Advisor or persons or entities outside **Lamkin Wealth Management** may cause irreparable damage to the business of **Lamkin Wealth Management**. The relationship between **Lamkin Wealth Management** and its clients, prospective clients, suppliers, directors, and shareholders is based on trust and confidence. Accordingly, Advisor agrees that, during and after Advisor's engagement for services to **Lamkin Wealth Management**, Advisor shall not directly or indirectly disclose to any person or entity or use for any purpose or permit the exploitation, copying, or summarizing of any Confidential Information of **Lamkin Wealth Management**, except as specifically required in the proper performance of Advisor's services to **Lamkin Wealth Management**. Advisors are prohibited from removing Confidential Information from **Lamkin Wealth Management**'s premises in any form or medium, except in the ordinary course of business of **Lamkin Wealth Management**, subject to approval by senior management.

c.        *Confidential Relationship.* **Lamkin Wealth Management** considers much of its Confidential Information to constitute "Trade Secrets," which have independent value, provide **Lamkin Wealth Management** with a competitive advantage over its competitors who do not know the Trade Secrets, and are protected from unauthorized disclosure under applicable law. However, whether or not the Confidential Information constitutes Trade Secrets, Advisor acknowledges and agrees that the Confidential Information is protected from unauthorized disclosure or use due to Advisor's obligations under this Agreement and duties as an advisor to clients of **Lamkin Wealth Management**.

Filed          24-CI-000543    01/22/2024    David L. Nicholson, Jefferson Circuit Clerk

A true copy attest    24-CI-000543    01/22/2024    /s/David L. Nicholson, Jefferson Circuit Clerk

©Peak Advisor Alliance          Page 1 of 5          www.peakadvisoralliance.com

Filed            24-CI-000543   01/22/2024        David L. Nicholson, Jefferson Circuit Clerk

A true copy attest    24-CI-000543   01/22/2024        /s/David L. Nicholson, Jefferson Circuit Clerk



## Lamkin Wealth Management

d.   *Duties.* Advisor acknowledges that **Lamkin Wealth Management** has instituted, and will continue to institute, update, and amend, policies and procedures designed to protect the confidentiality and security of **Lamkin Wealth Management**'s Confidential Information. Advisor agrees to take all appropriate action, whether by instruction, agreement, or otherwise to ensure the protection, confidentiality, and security of **Lamkin Wealth Management**'s Confidential Information, to protect the status of **Lamkin Wealth Management**'s Trade Secrets, and to satisfy Advisor's obligations under this Agreement.

e.   *Return of Documents.* Advisor acknowledges and agrees that the Confidential Information is and at all times shall remain the sole and exclusive property of **Lamkin Wealth Management**. Upon the termination of Advisor's services to **Lamkin Wealth Management** or upon request by **Lamkin Wealth Management** at any time, Advisor will promptly return to **Lamkin Wealth Management** in good condition all documents, data, and records of any kind, whether in hard copy or electronic form, which contain any Confidential Information or which were prepared based on Confidential Information, including any and all copies thereof, as well as all data and materials furnished to or acquired by Advisor during the course of Advisor's service agreement with **Lamkin Wealth Management**.

2.   **Development of Intellectual Property**.

a.   *Definition of Intellectual Property.* As used herein, the term "Intellectual Property" shall include, without limitation, any inventions, technological innovations, discoveries, designs, formulas, know-how, processes, patents, trademarks, service marks, copyrights, computer software, ideas, creations, writings, lectures, illustrations, photographs, motion pictures, scientific and mathematical models, improvements to all such property, and all recorded material defining, describing, or illustrating all such property, whether in hard copy or electronic form.

b.   ***Lamkin Wealth Management**'s Rights in Intellectual Property.* Advisor agrees that all rights, title, and interest of every kind and nature, whether now known or unknown, in and to any Intellectual Property invented, created, written, developed, conceived, or produced by Advisor during Advisor's service agreement with **Lamkin Wealth Management** (i) whether using **Lamkin Wealth Management**'s equipment, supplies, facilities and/or Confidential Information, (ii) whether alone or jointly with others, (iii) whether or not contemplated by the terms of Advisor's service agreement, and (iv) whether or not during normal hours during which Advisor renders services to **Lamkin Wealth Management**, that are within the scope of **Lamkin Wealth Management**'s actual or anticipated business operations or that relate to any of **Lamkin Wealth Management**'s actual or anticipated products or services shall be the exclusive property of **Lamkin Wealth Management**. To the extent any such Intellectual Property is copyrightable, it shall be deemed a "work made for hire" within the meaning of the copyright laws.

c.   *Advisor's Obligations.* Advisor agrees to take all reasonably necessary actions to enable **Lamkin Wealth Management** to obtain, register, perfect, and/or otherwise protect its rights in the Intellectual Property in the United States and all foreign countries. Without limiting the generality of the foregoing, Advisor hereby consents and agrees to: i) promptly and fully disclose to **Lamkin Wealth Management** any and all Intellectual Property; ii) assign to **Lamkin Wealth Management** all rights to such Intellectual Property without limitation or royalty; and iii) execute all documents necessary for **Lamkin Wealth Management** to obtain, register, perfect, or otherwise protect its rights in the Intellectual Property. Consideration for Advisor's assignment to **Lamkin Wealth Management** is hereby acknowledged. In the event **Lamkin Wealth Management** is unable, after reasonable effort, to secure Advisor's signature on any documents necessary to effectuate this provision, Advisor hereby irrevocably designates and appoints **Lamkin Wealth Management** as its agent and attorney-in-fact, to act for and on Advisor's behalf, and to execute any such documents and to do all other lawfully permitted acts to further the protection of such Intellectual Property with the same legal force and effect as if executed by Advisor. Advisor further agrees to assist **Lamkin Wealth Management** in connection with any demands, reissues, oppositions, litigation, controversy, or other actions involving any item of Intellectual Property. Advisor agrees to undertake the foregoing obligations both during and after Advisor's service agreement with **Lamkin Wealth Management**, without charge, but at **Lamkin Wealth Management**'s expense with respect to Advisor's reasonable out-of-pocket costs. Advisor further agrees that **Lamkin Wealth Management** may, in its sole discretion, deem such Intellectual Property as a Trade Secret, in which case Advisor will comply with the Confidential Information provisions of this Agreement.

3.   **Acknowledgment of Lamkin Wealth Management's Goodwill, Time, and Expense Incurred in Support of Advisor**. Advisor acknowledges that **Lamkin Wealth Management** has expended and will continue to expend considerable time, effort, and resources to develop and market its products and services, that the relationships between **Lamkin Wealth Management** and its employees, other independent contractors, clients, prospective clients, vendors, and suppliers are

Filed            24-CI-000543   01/22/2024        David L. Nicholson, Jefferson Circuit Clerk

A true copy attest    24-CI-000543   01/22/2024        /s/David L. Nicholson, Jefferson Circuit Clerk

©Peak Advisor Alliance                    Page 2 of 5                www.peakadvisoralliance.com

Filed                  24-CI-000543    01/22/2024        David L. Nicholson, Jefferson Circuit Clerk
A true copy attest      24-CI-000543   01/22/2024        /s/David L. Nicholson, Jefferson Circuit Clerk



### Lamkin Wealth Management

valuable assets of **Lamkin Wealth Management** and key to its success, and that employees and advisors to **Lamkin Wealth Management** establish close professional relationships with other employees, independent contractors, clients, vendors, and suppliers of **Lamkin Wealth Management** in the course of their relationship with **Lamkin Wealth Management**, all of which constitute goodwill of **Lamkin Wealth Management** ("Goodwill"). These strong business relationships developed over time allow **Lamkin Wealth Management** to provide the best possible solutions for its clients by providing **Lamkin Wealth Management** with an unequaled and valuable understanding of its clients' individual needs.

4.      **Non-solicitation , Non-accept of Clients.** In order to prevent the improper use of Confidential Information and the resulting unfair competition and misappropriation of **Lamkin Wealth Management**'s Goodwill and other proprietary interests, and in recognition of the consideration received by Advisor and value provided by **Lamkin Wealth Management** as described in this Agreement, Advisor agrees that while Advisor is rendering services to **Lamkin Wealth Management** and for a period of twenty-four (24) months following the end of Advisor's services to **Lamkin Wealth Management**, Advisor will not, directly or indirectly, on Advisor's own behalf or by aiding any other individual or entity, call for, solicit, nor if requested by a Client(s), accept, the business of any of **Lamkin Wealth Management**'s with whom Advisor had personal contact and did business within the twelve (12) month period immediately prior to the end of Advisor's services to **Lamkin Wealth Management** for the purpose of providing the client with products and/or services of the type or character typically provided by **Lamkin Wealth Management**. Provided, however, the non-solicitation provisions of this paragraph and the compensation to Advisor provided in paragraph nine hereof, shall not apply and Advisor shall be permitted to solicit and accept clients protected by this provision during the non-solicitation period by paying to **Lamkin Wealth Management** six (6) times the trailing twelve (12) months revenue received by **Lamkin Wealth Management** for each protected client to be solicited or accepted by Advisor during the first twelve (12) months following Advisor's termination; five (5) times the trailing twelve (12) months revenues if solicitation or acceptance is within months 13 through 15 following Advisor's termination; four (4) times the twelve (12) months revenues if solicitation or acceptance is within months 16 through 18 following Advisor's termination; three (3) times the twelve (12) months revenues if solicitation or acceptance is within months 19 through 21 following Advisor's termination; two (2) times the twelve (12) months revenues if solicitation or acceptance is within months 22 through 24 following Advisor's termination as consideration for the expense and investment by **Lamkin Wealth Management** in securing and servicing the client and the training and education of Advisor. This payment shall be made prior to any contact with client by Advisor following Advisor's termination. Advisor acknowledges that all clients managed by Advisor through **Lamkin Wealth Management** within twelve (12) months preceding a termination of Advisor's services are clients of **Lamkin Wealth Management** unless otherwise noted on an attachment to this Agreement.

5.      **Non-solicitation of Vendors/Employees.** In order to prevent the improper use of Confidential Information and the resulting unfair competition and misappropriation of **Lamkin Wealth Management**'s Goodwill and other proprietary interests, and in recognition of the consideration received by Advisor and value provided by **Lamkin Wealth Management** as described in this Agreement, Advisor agrees that while Advisor is providing services to **Lamkin Wealth Management** and for a period of twelve (12) months following end of Advisor's services to **Lamkin Wealth Management**, Advisor will not, directly or indirectly, on Advisor's own behalf or by aiding any other individual or entity, call on, solicit, nor, if requested by a **Lamkin Wealth Management** employee, accept the employment of any **Lamkin Wealth Management** employee with whom Advisor had personal contact during the twelve (12) month period immediately prior to the end of Advisor's services to **Lamkin Wealth Management**.

6.      **Reasonable Restrictions.** Advisor acknowledges and agrees that post termination of Advisor's services the obligations of this Agreement shall be applicable to Advisor regardless of whether Advisor engages in any such unfair business activity as an individual or as a sole proprietor, stockholder, partner, member, officer, director, employee, agent, consultant, or independent contractor of any other entity.

In signing this Agreement, Advisor is fully aware of the restrictions that this Agreement placed upon Advisor's future employment or contractual opportunities with an entity other than **Lamkin Wealth Management**. However, Advisor understands and agrees that Advisor's engagement for services to **Lamkin Wealth Management**, Advisor's privileged position with **Lamkin Wealth Management**, **Lamkin Wealth Management** expense in developing and supporting Advisor, and Advisor's access to Confidential Information of **Lamkin Wealth Management**, makes such restrictions both necessary and reasonable.

Filed                  24-CI-000543    01/22/2024        David L. Nicholson, Jefferson Circuit Clerk
A true copy attest      24-CI-000543   01/22/2024        /s/David L. Nicholson, Jefferson Circuit Clerk
Peak Advisor Alliance                                    Page 3 of 5                www.peakadviseralliance.com

Filed                    24-CI-000543    01/22/2024        David L. Nicholson, Jefferson Circuit Clerk
A true copy attest       24-CI-000543    01/22/2024        /s/David L. Nicholson, Jefferson Circuit Clerk



### Lamkin Wealth Management

Advisor acknowledges and agrees that the restrictions hereby imposed constitute reasonable protections of **Lamkin Wealth Management's** legitimate business interests and that these restrictions will not unduly restrict Advisor's opportunity to earn a reasonable living following termination of Advisor's services to **Lamkin Wealth Management**.

      7.     **Confidential Information of Competitors.** **Lamkin Wealth Management** does not want to receive and does not want Advisor to utilize any confidential or proprietary information belonging to Advisor's former employer(s) or other third parties. **Lamkin Wealth Management** expects Advisor to comply with Advisor's obligations to third parties relating to such information. **Lamkin Wealth Management** also expects Advisor to comply with any legally enforceable obligations that Advisor may have to former employers or third parties regarding the non-solicitation of clients, vendors, and Advisors.

      8.     **Notification.** **Lamkin Wealth Management** and Advisor acknowledge the confidentiality of this Agreement. Nevertheless, Advisor acknowledges and agrees that **Lamkin Wealth Management** may notify anyone employing or contracting with Advisor, or evidencing an intention to employ or contract with Advisor, as to the existence and provisions of this Agreement if **Lamkin Wealth Management**, in good faith, believes Advisor to be in violation of this Agreement.

      9.     **Termination Compensation.** As additional consideration for Advisor's execution of this Agreement and the promises contained herein, upon Advisor's termination with **Lamkin Wealth Management** for termination reasons including death, permanent disability, retirement, voluntary termination by Advisor, or involuntary termination by **Lamkin Wealth Management**, but excluding terminations by **Lamkin Wealth Management** for cause, **Lamkin Wealth Management** shall pay to Advisor, or Advisor's estate in the event of Advisor's death, over a period of twenty-four (24) months in monthly installments, an initial prorated amount equal to one (1) month of base commissions for each full year of service Advisor rendered to **Lamkin Wealth Management**, not to exceed twelve (12) service years, and subject to a signed general release from Advisor to **Lamkin Wealth Management**, in a form to be determined by **Lamkin Wealth Management** ("Termination Compensation"). Advisor's base commissions shall be determined by calculating the monthly average of the prior twenty-four (24) months commissions which shall be the basis for the initial twelve (12) month prorated payments. Termination Compensation for qualified Advisors shall be paid in equal installments over **Lamkin Wealth Management's** regular pay periods beginning on the effective date as defined in the general release described above. After the first twelve (12) equal monthly payments to Advisor, the remaining twelve (12) monthly payments shall be adjusted upward or downward according to the base commissions Advisor would have earned from **Lamkin Wealth Management** from clients who had been serviced by **Lamkin Wealth Management** prior to Advisor's termination. The last twelve (12) months of payments to qualifying Advisors or their estates shall be a "true up" for sums due pursuant to the formula set forth herein. Termination for cause shall include (a) embezzlement, theft, fraud, or other acts of dishonesty; (b) sexual harassment, moral turpitude, or conviction of a serious crime; (c) regulatory violations hampering Advisor's ability to act as an Advisor; and (d) violation of this Agreement. In the event Advisor solicits clients of **Lamkin Wealth Management** in violation of paragraph four of this Agreement, no payments shall be due to Advisor under this paragraph and any payments made to Advisor hereunder shall be repaid to **Lamkin Wealth Management**.

      10.     **Enforcement and/or Reimbursement.** If Advisor violates any of the terms of this Agreement, all **Lamkin Wealth Management** obligations to Advisor regarding Termination Compensation shall cease. In addition to the foregoing, to the extent that Advisor violates any provisions of this Agreement following receipt of Termination Compensation, Advisor shall be required to refund such amounts to **Lamkin Wealth Management**. Advisor and **Lamkin Wealth Management** agree that said Termination Compensation forfeitures and/or reimbursements represent only a small portion of the actual irreparable damages **Lamkin Wealth Management** would experience if Advisor violates the terms of this Agreement.

      Advisor acknowledges and agrees that, by reason of the sensitive nature of the Confidential Information, Intellectual Property, Trade Secrets, and Goodwill of **Lamkin Wealth Management** referred to in this Agreement, a breach of any of the promises or agreements contained herein will result in irreparable and continuing damage to **Lamkin Wealth Management** for which there may not be an adequate remedy at law. As such, Advisor acknowledges and agrees that, in addition to the foregoing and the recovery of any additional damages and any other legal relief to which **Lamkin Wealth Management** may be entitled in the event of Advisor's violation of this Agreement, **Lamkin Wealth Management** shall also be entitled to equitable relief, including such injunctive relief as may be necessary to protect the interests of **Lamkin Wealth Management** in such Confidential Information, Intellectual Property, Trade Secrets, and Goodwill and as may be necessary to specifically enforce this

Filed                    24-CI-000543    01/22/2024          David L. Nicholson, Jefferson Circuit Clerk
A true copy attest       24-CI-000543    01/22/2024          /s/David L. Nicholson, Jefferson Circuit Clerk



## Lamkin Wealth Management

Agreement.  Advisor further acknowledges that the remedies of forfeiture, reimbursement, and/or injunctive relief are cumulative and the Termination Compensation forfeiture/reimbursement is not intended as a "buyout" option for Advisor or as a substitute for Advisor's performance under this Agreement.

11.     **Severability**.  Advisor and **Lamkin Wealth Management** intend and agree that if a court of competent jurisdiction determines that the scope of any provision of this Agreement is too broad to be enforced as written, the court should reform such provision(s) to such narrower scope as it determines to be enforceable.  Advisor and **Lamkin Wealth Management** further agree that if any provision of this Agreement is determined to be unenforceable for any reason and such provision cannot be reformed by the court, such provision shall be deemed separate and severable and the unenforceability of any such provision shall not invalidate or render unenforceable any of the remaining provisions hereof.

12.     **Entire Agreement**.  Advisor acknowledges and agrees that this Agreement constitutes the entire agreement of the parties with respect to its subject matter and supersedes all prior and contemporaneous oral or written agreements between the parties relating to its subject matter.  No supplement, modification, or amendment of this Agreement shall be binding unless executed in writing by Advisor and **Lamkin Wealth Management**.

13.     **Miscellaneous**.

a.      *At-will Independent Contractor*.  If the Advisor is an at-will independent contractor, nothing contained in this Agreement shall be deemed to alter or modify Advisor's status as an at-will independent contractor of **Lamkin Wealth Management**.

b.      *Governing Law*.  This Agreement shall be construed under and in accordance with the laws of the State of {Insert State}.

c.      *Survival*.  Any provisions of this Agreement providing post-employment obligations will survive the termination of this or any agreement or relationship between Advisor and **Lamkin Wealth Management**.

d.      *Assignability*.  This Agreement and the rights, interests, and obligations of **Lamkin Wealth Management** hereunder shall be assignable to and shall inure to the benefit of any person, corporation, partnership, or entity that succeeds to all or substantially all of the business or assets of **Lamkin Wealth Management**.  The foregoing notwithstanding, if **Lamkin Wealth Management** attempts to assign this Agreement to any nonrelated (not under common ownership or control) person, corporation, partnership, or entity, such assignment shall require the written consent of Advisor.  This Agreement is not assignable by Advisor.

14.     **Advisor's Copy**.  ADVISOR ACKNOWLEDGES THAT ADVISOR HAS RECEIVED A COPY OF THIS AGREEMENT, HAS HAD AN OPPORTUNITY TO REVIEW THIS WITH LEGAL COUNSEL OF ADVISOR'S CHOOSING, THAT ADVISOR HAS READ, UNDERSTOOD, AND AGREES TO BE BOUND BY THE TERMS AND CONDITIONS CONTAINED IN THE AGREEMENT.

Executed as of the date first written above.

**Lamkin Wealth Management**

By_____

Its_____

_____
Advisor

Witness to Advisor's Signature

Filed                    24-CI-000543    01/22/2024          David L. Nicholson, Jefferson Circuit Clerk
A true copy attest       24-CI-000543    01/22/2024          /s/David L. Nicholson, Jefferson Circuit Clerk

Filed          24-CI-000543   01/22/2024      David L. Nicholson, Jefferson Circuit Clerk

A true copy attest   24-CI-000543   01/22/2024      /s/David L. Nicholson, Jefferson Circuit Clerk

# EXHIBIT C

Filed                    24-CI-000543    01/22/2024    David L. Nicholson, Jefferson Circuit Clerk
A true copy attest        24-CI-000543    01/22/2024    /s/David L. Nicholson, Jefferson Circuit Clerk



### Lamkin Wealth Management

# Non-Compete Representative Agreement

THIS AGREEMENT is made this ___ day of _____, 2015, by and between **Lamkin Wealth Management**, and _____, an at-will Independent Contractor or Employee Advisor, as the case may be, hereinafter "Advisor".

**WITNESSETH:**

WHEREAS, **Lamkin Wealth Management** has invested substantial time, effort, and money in the development of its trade secrets, business practices, and other confidential and proprietary information which has enabled **Lamkin Wealth Management** to compete successfully in its business, and the disclosure of such secrets, practices, or information would be greatly damaging to **Lamkin Wealth Management** and the continued success of its business; and

WHEREAS, during the course of Advisor's contractor services, **Lamkin Wealth Management's** has and will disclose to Advisor knowledge concerning its clients, trade secrets, business practices, and other specific confidential and proprietary information, all of which constitute the property of **Lamkin Wealth Management**.

NOW, THEREFORE, consistent with the above Recitals, which are hereby incorporated in this Agreement by this reference, and in consideration of **Lamkin Wealth Management** continued employment of, or use of Advisor's services, as the case may be, and to induce **Lamkin Wealth Management** to continue Advisor's services, and to allow Advisor to have access to and use of **Lamkin Wealth Management's** confidential and proprietary information, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, **Lamkin Wealth Management}** and Advisor hereby agree as follows:

1. **Nondisclosure of Confidential Information.**

   a.    *Access.* Advisor acknowledges that during its services on behalf of **Lamkin Wealth Management**, Advisor will have with **Lamkin Wealth Management** exposure to, familiarity with, and opportunity to learn highly sensitive, confidential, and proprietary information of **Lamkin Wealth Management** and its clients, which may include, without limitation, information about services, referral sources, clients and prospective clients, vendors and suppliers, various investment products, pricing, billing and collection procedures, proprietary software and the source code thereof, financial and accounting data, audit reports, personnel and compensation, data processing and communications, technical data, marketing strategies, training materials, policy and procedural manuals and bulletins, specific know-how regarding the business of **Lamkin Wealth Management** and its products and services, and personal and business information of clients, including, but not limited to, names, addresses, telephone numbers, assets and debts, loans, deposit accounts, balances, credit ratings, experiences, or information concerning any other transaction with **Lamkin Wealth Management** (collectively referred to herein as "Confidential Information").

   b.    *Valuable Asset.* Advisor further acknowledges that the Confidential Information is a valuable, special, and unique asset of **Lamkin Wealth Management**, such that the unauthorized disclosure or use by Advisor or persons or entities outside **Lamkin Wealth Management** may cause irreparable damage to the business of **Lamkin Wealth Management**. The relationship between **Lamkin Wealth Management** and its clients, prospective clients, suppliers, directors, and shareholders is based on trust and confidence. Accordingly, Advisor agrees that, during and after Advisor's engagement for services to **Lamkin Wealth Management**, Advisor shall not directly or indirectly disclose to any person or entity or use for any purpose or permit the exploitation, copying, or summarizing of any Confidential Information of **Lamkin Wealth Management**, except as specifically required in the proper performance of Advisor's services to **Lamkin Wealth Management**. Advisors are prohibited from removing Confidential Information from **Lamkin Wealth Management's** premises in any form or medium, except in the ordinary course of business of **Lamkin Wealth Management**, subject to approval by senior management.

   c.    *Confidential Relationship.* **Lamkin Wealth Management** considers much of its Confidential Information to constitute "Trade Secrets," which have independent value, provide **Lamkin Wealth Management** with a competitive advantage over its competitors who do not know the Trade Secrets, and are protected from unauthorized disclosure under applicable law. However, whether or not the Confidential Information constitutes Trade Secrets, Advisor acknowledges and agrees that the Confidential Information is protected from unauthorized disclosure or use due to Advisor's obligations under this Agreement and duties as an advisor to clients of **Lamkin Wealth Management**.

Filed                    24-CI-000543    01/22/2024    David L. Nicholson, Jefferson Circuit Clerk
A true copy attest        24-CI-000543    01/22/2024    /s/David L. Nicholson, Jefferson Circuit Clerk
@Peak Advisor Alliance                          Page 1 of 5          www.peakadvisoralliance.com

Filed                    24-CI-000543    01/22/2024          David L. Nicholson, Jefferson Circuit Clerk
A true copy attest       24-CI-000543    01/22/2024          /s/David L. Nicholson, Jefferson Circuit Clerk

**Lamkin Wealth Management**

      d.      *Duties.* Advisor acknowledges that **Lamkin Wealth Management** has instituted, and will continue to institute, update, and amend, policies and procedures designed to protect the confidentiality and security of **Lamkin Wealth Management**'s Confidential Information. Advisor agrees to take all appropriate action, whether by instruction, agreement, or otherwise to ensure the protection, confidentiality, and security of **Lamkin Wealth Management**'s Confidential Information, to protect the status of **Lamkin Wealth Management**'s Trade Secrets, and to satisfy Advisor's obligations under this Agreement.

      e.      *Return of Documents.* Advisor acknowledges and agrees that the Confidential Information is and at all times shall remain the sole and exclusive property of **Lamkin Wealth Management**. Upon the termination of Advisor's services to **Lamkin Wealth Management** or upon request by **Lamkin Wealth Management** at any time, Advisor will promptly return to **Lamkin Wealth Management** in good condition all documents, data, and records of any kind, whether in hard copy or electronic form, which contain any Confidential Information or which were prepared based on Confidential Information, including any and all copies thereof, as well as all data and materials furnished to or acquired by Advisor during the course of Advisor's service agreement with **Lamkin Wealth Management**.

      2.      <u>Development of Intellectual Property.</u>

      a.      *Definition of Intellectual Property.* As used herein, the term "Intellectual Property" shall include, without limitation, any inventions, technological innovations, discoveries, designs, formulas, know-how, processes, patents, trademarks, service marks, copyrights, computer software, ideas, creations, writings, lectures, illustrations, photographs, motion pictures, scientific and mathematical models, improvements to all such property, and all recorded material defining, describing, or illustrating all such property, whether in hard copy or electronic form.

      b.      ***Lamkin Wealth Management's Rights in Intellectual Property.*** Advisor agrees that all rights, title, and interest of every kind and nature, whether now known or unknown, in and to any Intellectual Property invented, created, written, developed, conceived, or produced by Advisor during Advisor's service agreement with **Lamkin Wealth Management** (i) whether using **Lamkin Wealth Management**'s equipment, supplies, facilities and/or Confidential Information, (ii) whether alone or jointly with others, (iii) whether or not contemplated by the terms of Advisor's service agreement, and (iv) whether or not during non-hours during which Advisor renders services to **Lamkin Wealth Management**, that are within the scope of **Lamkin Wealth Management**'s actual or anticipated business operations or that relate to any of **Lamkin Wealth Management**'s actual or anticipated products or services shall be the exclusive property of **Lamkin Wealth Management**. To the extent any such Intellectual Property is copyrightable, it shall be deemed a "work made for hire" within the meaning of the copyright laws.

      c.      *Advisor's Obligations.* Advisor agrees to take all reasonably necessary actions to enable **Lamkin Wealth Management** to obtain, register, perfect, and/or otherwise protect its rights in the Intellectual Property in the United States and all foreign countries. Without limiting the generality of the foregoing, Advisor hereby consents and agrees to: i) promptly and fully disclose to **Lamkin Wealth Management** any and all Intellectual Property; ii) assign to **Lamkin Wealth Management** all rights to such Intellectual Property without limitation or royalty; and iii) execute all documents necessary for **Lamkin Wealth Management** to obtain, register, perfect, or otherwise protect its rights in the Intellectual Property. Consideration for Advisor's assignment to **Lamkin Wealth Management** is hereby acknowledged. In the event **Lamkin Wealth Management** is unable, after reasonable effort, to secure Advisor's signature on any documents necessary to effectuate this provision, Advisor hereby irrevocably designates and appoints **Lamkin Wealth Management** as its agent and attorney-in-fact, to act for and on Advisor's behalf, and to execute any such documents and to do all other lawfully permitted acts to further the protection of such Intellectual Property with the same legal force and effect as if executed by Advisor. Advisor further agrees to assist **Lamkin Wealth Management** in connection with any demands, reissues, oppositions, litigation, controversy, or other actions involving any item of Intellectual Property. Advisor agrees to undertake the foregoing obligations both during and after Advisor's service agreement with **Lamkin Wealth Management**, without charge, but at **Lamkin Wealth Management**'s expense with respect to Advisor's reasonable out-of-pocket costs. Advisor further agrees that **Lamkin Wealth Management** may, in its sole discretion, deem such Intellectual Property as a Trade Secret, in which case Advisor will comply with the Confidential Information provisions of this Agreement.

      3.      <u>Acknowledgment of Lamkin Wealth Management's Goodwill, Time, and Expense Incurred in Support of Advisor.</u> Advisor acknowledges that **Lamkin Wealth Management** has expended and will continue to expend considerable time, effort, and resources to develop and market its products and services, that the relationships between **Lamkin Wealth Management** and its employees, other independent contractors, clients, prospective clients, vendors, and suppliers are

Filed                    24-CI-000543    01/22/2024          David L. Nicholson, Jefferson Circuit Clerk
A true copy attest       24-CI-000543    01/22/2024          /s/David L. Nicholson, Jefferson Circuit Clerk



**Lamkin Wealth Management**

valuable assets of **Lamkin Wealth Management** and key to its success, and that employees and advisors to **Lamkin Wealth Management** establish close professional relationships with other employees, independent contractors, clients, vendors, and suppliers of **Lamkin Wealth Management** in the course of their relationship with **Lamkin Wealth Management**, all of which constitute goodwill of **Lamkin Wealth Management** ("Goodwill"). These strong business relationships developed over time allow **Lamkin Wealth Management** to provide the best possible solutions for its clients by providing **Lamkin Wealth Management** with an unequaled and valuable understanding of its clients' individual needs.

4.    **Non-solicitation , Non-accept of Clients**. In order to prevent the improper use of Confidential Information and the resulting unfair competition and misappropriation of **Lamkin Wealth Management**'s Goodwill and other proprietary interests, and in recognition of the consideration received by Advisor and value provided by **Lamkin Wealth Management** as described in this Agreement, Advisor agrees that while Advisor is rendering services to **Lamkin Wealth Management** and for a period of twenty-four (24) months following the end of Advisor's services to **Lamkin Wealth Management**, Advisor will not, directly or indirectly, on Advisor's own behalf or by aiding any other individual or entity, call for, solicit, nor if requested by a Client(s), accept, the business of any of **Lamkin Wealth Management**'s with whom Advisor had personal contact and did business within the twelve (12) month period immediately prior to the end of Advisor's services to **Lamkin Wealth Management** for the purpose of providing the client with products and/or services of the type or character typically provided by **Lamkin Wealth Management**. Provided, however, the non-solicitation provisions of this paragraph and the compensation to Advisor provided in paragraph nine hereof, shall not apply and Advisor shall be permitted to solicit and accept clients protected by this provision during the non-solicitation period by paying to **Lamkin Wealth Management** three (3) times the trailing twelve (12) months revenue received by **Lamkin Wealth Management** for each protected client to be solicited or accepted by Advisor during the first twelve (12) months following Advisor's termination as consideration for the expense and investment by **Lamkin Wealth Management** in securing and servicing the client and the training and education of Advisor. If there is not a twelve (12) month revenue, the firm will average the preceding 3 years revenue and the buy-out is based upon the higher number. This is agreed upon for 24 months after separation, meaning that if a client leaves Lamkin Wealth Management this agreement is enforceable. This agreement excludes clients that are in the rep code(s) ___**BSED**___ as of 0**5**/**00**/2015. Any other clients, rep codes or business garnered from **Lamkin Wealth Management**, Advisor agrees to pay **Lamkin Wealth Management** as written within this document and this payment shall be made prior to any contact with client by Advisor following Advisor's termination. Advisor acknowledges that all other clients managed by Advisor through **Lamkin Wealth Management** are clients of **Lamkin Wealth Management** unless otherwise noted above in this Agreement.

5.    **Non-solicitation of Vendors/Employees**. In order to prevent the improper use of Confidential Information and the resulting unfair competition and misappropriation of **Lamkin Wealth Management**'s Goodwill and other proprietary interests, and in recognition of the consideration received by Advisor and value provided by **Lamkin Wealth Management** as described in this Agreement, Advisor agrees that while Advisor is providing services to **Lamkin Wealth Management** and for a period of twelve (12) months following end of Advisor's services to **Lamkin Wealth Management**, Advisor will not, directly or indirectly, on Advisor's own behalf or by aiding any other individual or entity, call on, solicit, nor, if requested by a **Lamkin Wealth Management** employee, accept the employment of any **Lamkin Wealth Management** employee with whom Advisor had personal contact during the twelve (12) month period immediately prior to the end of Advisor's services to **Lamkin Wealth Management**.

6.    **Reasonable Restrictions**. Advisor acknowledges and agrees that post termination of Advisor's services the obligations of this Agreement shall be applicable to Advisor regardless of whether Advisor engages in any such unfair business activity as an individual or as a sole proprietor, stockholder, partner, member, officer, director, employee, agent, consultant, or independent contractor of any other entity.

In signing this Agreement, Advisor is fully aware of the restrictions that this Agreement placed upon Advisor's future employment or contractual opportunities with an entity other than **Lamkin Wealth Management**. However, Advisor understands and agrees that Advisor's engagement for services to **Lamkin Wealth Management**, Advisor's privileged position with **Lamkin Wealth Management**, **Lamkin Wealth Management** expense in developing and supporting Advisor, and Advisor's access to Confidential Information of **Lamkin Wealth Management**, makes such restrictions both necessary and reasonable.

Case 3:24-cv-00168-CHB   Document 1-1   Filed 03/08/24   Page 49 of 52 PageID #: 53
Filed            24-CI-000543   01/22/2024   David L. Nicholson, Jefferson Circuit Clerk
A true copy attest    24-CI-000543   01/22/2024   /s/David L. Nicholson, Jefferson Circuit Clerk



**Lamkin Wealth Management**

Advisor acknowledges and agrees that the restrictions hereby imposed constitute reasonable protections of **Lamkin Wealth Management's** legitimate business interests and that these restrictions will not unduly restrict Advisor's opportunity to earn a reasonable living following termination of Advisor's services to **Lamkin Wealth Management**.

7.    **Confidential Information of Competitors**. **Lamkin Wealth Management** does not want to receive and does not want Advisor to utilize any confidential or proprietary information belonging to Advisor's former employer(s) or other third parties. **Lamkin Wealth Management** expects Advisor to comply with Advisor's obligations to third parties relating to such information. **Lamkin Wealth Management** also expects Advisor to comply with any legally enforceable obligations that Advisor may have to former employers or third parties regarding the non-solicitation of clients, vendors, and Advisors.

8.    **Notification**. **Lamkin Wealth Management** and Advisor acknowledge the confidentiality of this Agreement. Nevertheless, Advisor acknowledges and agrees that **Lamkin Wealth Management** may notify anyone employing or contracting with Advisor, or evidencing an intention to employ or contract with Advisor, as to the existence and provisions of this Agreement if **Lamkin Wealth Management**, in good faith, believes Advisor to be in violation of this Agreement.

9.    **Termination Compensation**. As additional consideration for Advisor's execution of this Agreement and the promises contained herein, upon Advisor's termination with **Lamkin Wealth Management** for termination reasons including death, permanent disability, retirement, voluntary termination by Advisor, or involuntary termination by **Lamkin Wealth Management**, but excluding terminations by **Lamkin Wealth Management** for cause, **Lamkin Wealth Management** shall pay to Advisor, or Advisor's estate in the event of Advisor's death, over a period of twenty-four (24) months in monthly installments, an initial prorated amount equal to one (1) month of base commissions for each full year of service Advisor rendered to **Lamkin Wealth Management**, not to exceed twelve (12) service years, and subject to a signed general release from Advisor to **Lamkin Wealth Management**, in a form to be determined by **Lamkin Wealth Management** ("Termination Compensation"). Advisor's base commissions shall be determined by calculating the monthly average of the prior twenty-four (24) months commissions which shall be the basis for the initial twelve (12) month prorated payments. Termination Compensation for qualified Advisors shall be paid in equal installments over **Lamkin Wealth Management's** regular pay periods beginning on the effective date as defined in the general release described above. After the first twelve (12) equal monthly payments to Advisor, the remaining twelve (12) monthly payments shall be adjusted upward or downward according to the base commissions Advisor would have earned from **Lamkin Wealth Management** from clients who had been serviced by **Lamkin Wealth Management** prior to Advisor's termination. The last twelve (12) months of payments to qualifying Advisors or their estates shall be a "true up" for sums due pursuant to the formula set forth herein. Termination for cause shall include (a) embezzlement, theft, fraud, or other acts of dishonesty; (b) sexual harassment, moral turpitude, or conviction of a serious crime; (c) regulatory violations hampering Advisor's ability to act as an Advisor; and (d) violation of this Agreement. In the event Advisor solicits clients of **Lamkin Wealth Management** in violation of paragraph four of this Agreement, no payments shall be due to Advisor under this paragraph and any payments made to Advisor hereunder shall be repaid to **Lamkin Wealth Management**.

10.    **Enforcement and/or Reimbursement**. If Advisor violates any of the terms of this Agreement, all **Lamkin Wealth Management** obligations to Advisor regarding Termination Compensation shall cease. In addition to the foregoing, to the extent that Advisor violates any provisions of this Agreement following receipt of Termination Compensation, Advisor shall be required to refund such amounts to **Lamkin Wealth Management**. Advisor and **Lamkin Wealth Management** agree that said Termination Compensation forfeitures and/or reimbursements represent only a small portion of the actual irreparable damages **Lamkin Wealth Management** would experience if Advisor violates the terms of this Agreement.

Advisor acknowledges and agrees that, by reason of the sensitive nature of the Confidential Information, Intellectual Property, Trade Secrets, and Goodwill of **Lamkin Wealth Management** referred to in this Agreement, a breach of any of the promises or agreements contained herein will result in irreparable and continuing damage to **Lamkin Wealth Management** for which there may not be an adequate remedy at law. As such, Advisor acknowledges and agrees that, in addition to the foregoing and the recovery of any additional damages and any other legal relief to which **Lamkin Wealth Management** may be entitled in the event of Advisor's violation of this Agreement, **Lamkin Wealth Management** shall also be entitled to equitable relief, including such injunctive relief as may be necessary to protect the interests of **Lamkin Wealth Management** in such Confidential Information, Intellectual Property, Trade Secrets, and Goodwill and as may be necessary to specifically enforce this

Filed          24-CI-000543   01/22/2024      David L. Nicholson, Jefferson Circuit Clerk
A true copy attest   24-CI-000543   01/22/2024      /s/David L. Nicholson, Jefferson Circuit Clerk

**Lamkin Wealth Management**

Agreement. Advisor further acknowledges that the remedies of forfeiture, reimbursement, and/or injunctive relief are cumulative and the Termination Compensation forfeiture/reimbursement is not intended as a "buyout" option for Advisor or as a substitute for Advisor's performance under this Agreement.

11.     **Severability.** Advisor and **Lamkin Wealth Management** intend and agree that if a court of competent jurisdiction determines that the scope of any provision of this Agreement is too broad to be enforced as written, the court should reform such provision(s) to such narrower scope as it determines to be enforceable. Advisor and **Lamkin Wealth Management** further agree that if any provision of this Agreement is determined to be unenforceable for any reason and such provision cannot be reformed by the court, such provision shall be deemed separate and severable and the unenforceability of any such provision shall not invalidate or render unenforceable any of the remaining provisions hereof.

12.     **Entire Agreement.** Advisor acknowledges and agrees that this Agreement constitutes the entire agreement of the parties with respect to its subject matter and supersedes all prior and contemporaneous oral or written agreements between the parties relating to its subject matter. No supplement, modification, or amendment of this Agreement shall be binding unless executed in writing by Advisor and **Lamkin Wealth Management**.

13.     **Miscellaneous.**

a.     *At-will Independent Contractor.* If the Advisor is an at-will independent contractor, nothing contained in this Agreement shall be deemed to alter or modify Advisor's status as an at-will independent contractor of **Lamkin Wealth Management**.

b.     *Governing Law.* This Agreement shall be construed under and in accordance with the laws of the State of {Insert State}.

c.     *Survival.* Any provisions of this Agreement providing post-employment obligations will survive the termination of this or any agreement or relationship between Advisor and **Lamkin Wealth Management**.

d.     *Assignability.* This Agreement and the rights, interests, and obligations of **Lamkin Wealth Management** hereunder shall be assignable to and shall inure to the benefit of any person, corporation, partnership, or entity that succeeds to all or substantially all of the business or assets of **Lamkin Wealth Management**. The foregoing notwithstanding, if **Lamkin Wealth Management** attempts to assign this Agreement to any nonrelated (not under common ownership or control) person, corporation, partnership, or entity, such assignment shall require the written consent of Advisor. This Agreement is not assignable by Advisor.

14.     **Advisor's Copy.** ADVISOR ACKNOWLEDGES THAT ADVISOR HAS RECEIVED A COPY OF THIS AGREEMENT, HAS HAD AN OPPORTUNITY TO REVIEW THIS WITH LEGAL COUNSEL OF ADVISOR'S CHOOSING, THAT ADVISOR HAS READ, UNDERSTOOD, AND AGREES TO BE BOUND BY THE TERMS AND CONDITIONS CONTAINED IN THE AGREEMENT.

Executed as of the date first written above.

Lamkin Wealth Management

By _____

Its _____

_____
Advisor

Witness to Advisor's Signature

_____

Filed          24-CI-000543   01/22/2024      David L. Nicholson, Jefferson Circuit Clerk
A true copy attest   24-CI-000543   01/22/2024      /s/David L. Nicholson, Jefferson Circuit Clerk

David L. Nicholson, Jefferson Circuit Clerk
600 West Jefferson Street
Louisville, KY 40202-4731
Case Number: 24-CI-000543

Office of the Secretary of State
Summons Branch
700 Capital Ave., Suite. 86
Frankfort, KY 40601



# KCOJ eFiling Cover Sheet

Case Number: 24-CI-000543

Envelope Number: 7203569

Package Retrieval Number: 720356948695394@00001056074

Service by: Long Arm Statute – Secretary of State

Service Fee: $ 10.00

Postage Fee: $ 25.15

The attached documents were generated via the Kentucky Court of Justice eFiling system. For more information on eFiling, go to http://courts.ky.gov/efiling.

Generated: 1/23/2024 11:32:36 AM

MICHAEL G. ADAMS
SECRETARY OF STATE
P.O. Box 718
Frankfort, Kentucky 40602-0718

☑ REGISTER TO VOTE

9589 0710 5270 1620 5379 35

LPL FINANCIAL, LLC
1055 LPL WAY
FORT MILL, SC 29715

FIRST-CLASS

US POSTAGE

